THOMAS KINGSTON, JULIA M. MACK, WARREN GEIGER, JOHN W. DOAN, MARY F. LYNCH and JOHN C. MAGINNIS,

*vs.*

HOME LIFE INSURANCE COMPANY OF AMERICA, and HOME PROTECTIVE COMPANY.

*New Castle, April 19, 1917.*

The right of shareholders to subscribe for new shares issued by a corporation as an increase of its capital stock in preference to outsiders is well established, being known as a shareholder's pre-emptive right.

New shares of corporate stock cannot be issued for an improper purpose, as to maintain control of a corporation.

A contract between a corporation and an outsider, giving the latter the exclusive right to take at par a large number of shares of corporate stock without regard to time, being valid as between the corporation and the outsider, cannot be attacked by those acquiring their stock subsequent to the execution of the contract, though ignorant of it, for it does not infringe on the pre-emptive right of such shareholders.

Where a contract between an insurance company and an outsider, authorizing him to take at par, without limitation as to time, certain corporate stock to be thereafter issued, was assigned to defendant, which made loans to enable the company to extend its business, and such loans were very beneficial, the contract cannot be overthrown, on the ground that it was oppressive, because the stock of the company sold above par.

A contract between a private corporation and a third person, authorizing the third person to take, without limitation as to time, certain corporate stock thereafter to be issued, does not infringe the rule against perpetuities, which was intended to prevent undue restraint on the alienation of land, and should not be extended to apply to sales of the stock of a private business curporation.

A contract whereby defendant was to furnish insurance company, engaged in writing industrial policies, with funds to secure new business, is not illegal or unfair as to the insurance company, which was a new corporation, and which needed such funds, as it could not legally use its capital stock for working capital, as a working surplus would be slowly built up, and as the contract provided that repayment should be made

only out of the surplus of the company above a fixed amount, unless it should be dissolved, when payment should be made out of the capital stock; this being so, though the status of the loans was misrepresented on the books of the insurance company and defendant.

Where it was estimated that the value of land purchased with the capital of an insurance company had enhanced, and it was shown that an officer, authorized to purchase land for a fixed amount, acquired it for less, such enchanement in the value of the land and the saving effected were not profits out of which dividends, that can only be paid out of surplus, or net profits, arising from the business, could be declared.

The statutory liability of officers who improperly declare a dividend cannot be enforced in an action against the corporation and another company to annul contracts, enjoin payments of dividends, etc., the officers not being parties.

As the only purpose of a receivership for an insurance company would be a liquidation of the business, for a receiver could not carry it on indefinitely, a receiver will not be appointed because dividends may have been illegally declared, where liquidation was not desired, even though an injunction against declaration of future illegal dividends must be general.

As the insurance commissioner has extensive powers with respect to the conduct of an insurance company's business, particularly with respect to the impairment of capital, a receiver of an insurance company will not be appointed because the capital may be somewhat impaired, when the real property of the company is correctly valued; this being particularly true where there was testimony that if liquidated, the net value of the stock of the company would exceed its par value.

Where a contract by which the president of an insurance company, who personally assumed at its face value a worthless account, was to receive commissions on insurance written, was not oppressive or fraudulent, a receiver will not be appointed, though the president, in making his report to the insurance commissioner, mistated the facts as to payment of premiums to him.

BILL BY SHAREHOLDERS of an insurance company to annul contracts made by the company and to correct irregularities and unlawful acts of officers and directors. The cause was heard on the bill, the joint answer of the two defendants and testimony and exhibits. The facts appear in the opinion of the Chancellor.

*Caleb S. Layton*, and with him *Thomas Raeburn White*, of the Philadelphia Bar, for the complainants.

*Charles F. Curley*, and with him *John P. Connelly*, of the Philadelphia Bar, for the defendants.

THE CHANCELLOR. The six complainants, all stockholders of the Home Life Insurance Company of America, a Delaware corporation, have filed their bill against that company and the Home Protective Company, also a Delaware corporation, on behalf of themselves and of other stockholders. It appears that the officers of the two defendant companies are, and for more than nine years and during the transactions complained of, have been the same persons, and during the same period a majority of the directors of the insurance Company were also directors of the Protective Company. Up to 1907, the Protective Company owned practically all the outstanding shares of the Insurance Company and therefore controlled it. Afterwards, and until the latter part of 1913, the Protective Company sold shares of the Insurance Company at prices about double the par value thereof. The shares so sold were sold largely in connection with policies of insurance negotiated by agents of the Insurance Company, the persons insured being given a right to take such shares. Some at least of the shares so disposed of, and others afterwards acquired by the Protective Company, were issued pursuant to an option given by the Insurance Company and acquired by the Protective Company. This option had its origin in the action of the directors of the Insurance Company at a meeting on October 29, 1906, whereby it gave to Paul Bright the exclusive right to purchase one hundred thousand dollars worth of stock at par which was then one hundred dollars per share and which was afterwards reduced to ten dollars per share. At this time one hundred thousand dollars of stock had been issued out of an authorized capital of two hundred and fifty thousand dollars. By an agreement dated April 15, 1907, the Protective Company purchased from Bright the entire good will and business of the Insurance Company and the entire outstanding stock, amounting to one hundred thousand dollars, at par ten dollars, for the

Kingston, et al.; vs. Home Life Ins. Co., et al.  261

Opinion.

total consideration of one hundred and fifty-five thousand dollars, and later Bright assigned to the Protective Company the option which he had to subscribe for stock of the Insurance Company. At a meeting of the stockholders of the Insurance Company held January 21, 1908, it was by motion duly carried agreed that the surplus earnings, if any, be paid to the Protective Company "for financing the Home Life Insurance Company of America," and authority was given to the directors to increase the authorized capital from two hundred and fifty thousand dollars to not exceeding one million dollars, contemplating, of course, that proper legal steps would be taken for the purpose. At a meeting of the stockholders of the Insurance Company held February 16, 1909, a resolution reciting the giving of the option to Bright, the assignment thereof to the Protective Company and the proposed increase of capital, and also reciting that the Protective Company had contributed or advanced to the Insurance Company moneys and securities to enable it to maintain its legal reserve and build up its business, and stating that the contributions or advances would continue as needed by the Insurance Company and be returned out of surplus earnings, and extending the option to include the entire capital stock, was adopted by the stockholders.

In explanation of the advances or contributions made by the Protective Company to the Insurance Company it was stated in the answer and shown that the moneys were needed to acquire new business either through soliciting agents or by reinsuring the risks of other insurance companies, and under the insurance laws the usual income of the company could not be used for such purpose. It was explained also that to grow rapidly it was necessary for a newly organized insurance company to make large expenditures in excess of the premiums collected by it in order to pay soliciting agents, and that after the business increased to large proportions the receipts will exceed such expenses. In other words, it costs a new company more to place insurance than is received from those insured. To enable the Home Life Insurance Company to so grow rapidly the Protective Company paid to the Insurance Company at various times sums of money.

Finally, at the annual meeting of the stockholders of the Insurance Company, held February 19, 1915, a resolution was adopted reciting the action of the meeting of January 21, 1908; and that about four hundred and seventy thousand dollars had been received from the Protective Company by the Insurance Company, of which about eighty-one thousand dollars had been re-paid; and authorizing the execution of obligations for the sums so contributed and advanced and those to be contributed and advanced, with interest at six per centum, the obligations to be made payable only out of surplus in excess of ten thousand dollars while the Insurance Company should continue in active business and the obligations should not be considered a lien or debt against the insurance Company, or be due or payable, except in the event of dissolution or retirement of the company. Up to 1912 the Protective Company actually held a majority of all the stock of the Insurance Company, and after that time though it had not control as a majority stockholder, it had and still has power to secure control by exercising the option to take stock. The Protective Company now holds about six thousand shares of the Insurance Company out of about sixteen thousand outstanding. About eighty-five hundred shares remain unissued, and the Protective Company has the right to take at par these unissued shares to the exclusion of the other stockholders. Between 1907 and the latter part of 1913 the Protective Company took under its option shares of the Insursance Company at par and sold them in connection with insurance policies at from two to three times the par value, and from 1913 to 1916 took none. But in June, 1916, after some of the stockholders of the company had expressed dissatisfaction with its course and threatened to take legal proceedings, the Protective Company took at par thirty-seven hundred shares of the Insurance Company under the option. Up to a very recent date the officers and directors of the insurance Company held very few of its shares, and were large holders of shares of the Protective Company, of which they were also officers and directors.

By the bill the complainants allege that the plan of financing the Insurance Company by the Protective Company was

fraudulent both inherently and by the method of carrying it out. The plan briefly stated was and is (and as to this there is no dispute) that the Protective Company should furnish to the Insurance Company money to acquire new business for the latter, and in return therefor the Protective Company was given a perpetual and exclusive right to subscribe to the stock of the Insurance Company at par, the Insurance Company being liable to return all the money advanced, with interest, only out of surplus in excess of ten thousand dollars, or in case of liquidation out of the assets of the company. It is alleged and shown that there were certain deceptions practiced by the officers of the two companies, who were the same persons, and particularly in the entries in the books of the Insurance Company and in its reports, official statements, which were misleading and evidence of a fraudulent purpose. It is also alleged that dividends were paid otherwise than from earnings, and that the capital of the company had been impaired.

But independent of these and some other considerations it should be first determined whether this agreement or option to purchase was valid, or invalid; and if invalid, then what relief should be granted. For the complainants it is urged that the stock option was in itself illegal and void, (1) because it violates the fundamental right of stockholders to share equally in the distribution of unissued stock, or to purchase the same upon equal terms and to maintain the same proportion of the control of the company as existed prior to such issue; and (2) because it is in violation of the rule against perpetuities. Was the option contract invalid because it destroyed the pre-emptive right of stockholders to take the shares? The right of shareholders to subscribe for new shares issued by a corporation as an increase of its capital stock in preference to outsiders is well established, and is called a shareholder's pre-emptive right. 1 *Machen on Corporations*, § 603; 7 *Ruling Case Law*, 176; 1 *Cook on Corporations* (*7th Ed.*) §§ 70, 286, 614, 653. In some cases it has been held that the right does not exist as to the original authorized capital, but only as to an increase of authorized capital. 1 *Machen on Corporations*, § 618. But this is not clear, and it is difficult in particular cases to determine what

264 Kingston, et al., vs. Home Life Ins. Co., et al.

Opinion.

can rightly be called a new issue of stock, as for instance, where the authorized capital stock was not increased by virtue of an amendment of the charter, and the new issue of shares were part of the capital stock as originally authorized, but issued after a substantially long period subsequent to the original issue of shares. New shares cannot be issued for an improper purpose, as for instance, to maintain control of the corporation. These principles are stated in 2 *Cook on Corporations*, (7th Ed.) § 614.

But these principles have no application to this case. In 1906, Paul Bright was given the exclusive right to take at par one hundred thousand dollars of shares of the company without limit of time. At that time the legally authorized capital stock of the company was and still is two hundred and fifty thousand dollars, and one hundred thousand dollars of it had been issued and was then outstanding. Those who then held shares of stock of the company could probably have asserted their rights in opposition to this grant to Bright. Whether they can still do so need not now be considered, for none of them are complainants in this case. All of the complainants acquired their stock subsequent to the original and the later action of the company granting and confirming the option, and subsequent to the meeting of the stockholders thereof held in 1909, at which meeting the action of the board of directors in giving the original option and in extending it to any shares to be issued after the capital stock had been increased beyond two hundred and fifty thousand dollars was confirmed by the stockholders. None of the complainants, except Maginnis, are shown to have had knowledge of the option prior to acquiring their shares. Maginnis when he bought his shares knew of the affairs of the company fully, and presumably knew of this option.

One who acquires shares of stock of a corporation after the corporation by action of its officers, directors and stockholders has given to a stranger an exclusive right to take and pay for at par all of the unissued shares of the company, cannot assert as against the company, or the holder of the option, the general pre-emptive right of shareholders of a corporation.

No authority was cited or found for or against the above proposition, but it is clearly sound and based on fundamental considerations. As between the corporation and the holder of the option such a contract is valid, and can be held invalid only at the instance and for the benefit of a stockholder who asserts his right to take the stock, and whose right has been impaired, by the giving of the option. If, however, before a particular person became a shareholder another person has acquired an option inconsistent with the pre-emptive right, then the latter is subservient to the former right. When the original contract was made between Bright and the company it might have been invalid for lack of consideration; but when later the stockholders at the meeting in 1909 ratified it and extended its scope, there was then consideration based on the advances or other financial assistance given and continued to the company by the holder of the option.

Did the extension of the option so as to make it include shares to be thereafter issued by the company when the capital stock should be increased by law invalidate the agreement, or give the complainants a right to have it declared inoperative in so far as it limits their rights as stockholders? Probably not, for reasons hereinabove stated. But inasmuch as the limit of authorized capital stock has not yet been increased, the question is not now a vital one for the present solution.

It is immaterial that some of the complainant's had no knowledge or notice of the existence of the option before acquiring their shares, for there was no representation by the company, or the holder of the option, respecting unissued shares upon which the complainants relied to their detriment or disadvantage. The right to take at par stock which was salable at more than par did not necessarily invalidate the option; that would depend on circumstances. It might be so inequitable, oppressive, or unjust, as to shock the conscience of the court, or be fraudulent or without consideration. But it is not clear that this contract may be so characterized. While Bright held the option it may not have been advantageous to the Insurance Company. But after it had been acquired by the Protective Company and that company had made large ad-

vances of money to the Insurance Company to enlarge its business and increase its profits and stability, it was not and is not so glaringly inequitable as to call for its annulment by this court, particularly if, as the complainants urged, the advances were contributions, made without expectation of repayment. For these reasons, then, the complainants are not entitled to have the option contract set aside or affected in so far as it relates to the stock of the company as originally authorized, without deciding upon their rights with respect to shares in case the capital stock of the company be increased.

Does the contract made by the Insurance Comapny with Bright, and subsequently assigned to the Protective Company, violate the rule against perpetuities? Is a contract by which one corporation gives an option to take and pay for at a fixed price all of the unissued shares of its capital stock invalid because it violates the rule against perpetuities? According to the authorities cited by the complainants, an unlimited option to purchase land is a contract in restraint of alienation of land and against public policy, and therefore void. *Barton v. Thaw*, 246 *Pa. St.* 348, 92 *Atl.* 312, *Ann. Cas.* 1916D, 570; *London, etc., Co. v. Gomm, L. R.* 20 *Ch. Div.* 562. In general the rule against remoteness in the time of vesting future interests applies to personalty as well as realty. *Lewis on Perpetuities; Gray on Perpetuities*, § 202. But almost all of the cases in which the rule has been applied to personalty the instrument by which the future right was created related to land, such as leaseholds or chattels real. In three Maryland cases cited the rule was applied to bequests of future interests in slaves. *Johnson v Lish*, 4 *Harr. & J.* (*Md.*) 441; *Matthews v. Daniel*, 3 *N. C.* 346; *Hatton v. Weems*, 12 *Gill & J.* (*Md.*) 83.

However, the real purpose of the rule was to prevent inalienability of land, *i. e.*, to prevent its being tied up for an unreasonably long period whereby it was kept out of commerce. Public policy was the reason for the rule. This was peculiarly applicable to land and interests in land.

Has it any relation to contracts as to shares of stock of a private business corporation? There is no principle of public policy involved. It can make no difference to the general pub-

lic, or to any one other than stockholders of that particular ·company. To tie up land, which is the source of all wealth, is quite a different thing from giving an unlimited option to buy all unissued shares of a corporation doing a private business. No case has been produced or found which so extends the rule respecting real estate and interests in real estate, however sound, wholesome and well established the rule be with respect to land, and this court is not justified in extending it to the stock option, and, therefore, cannot hold the option contract entirely invalid for either of the reasons urged.

Was the plan by which financial assistance was given to the Insurance Company by the Protective Company illegal or unfair to the Insurance Company? It was clearly shown that free working cash capital was very important to the rapid development and success of the business of a life insurance company, and particularly where it is issuing policies called industrial insurance. An important element in such success is the size, or number, of policies issued. Where the company is a new one the cost of getting new buisness for a time exceeds the premiums received from holders of the policies. The capital stock of the company cannot under the laws of this State be used for such working capital, for it must be maintained intact. The working capital is secured by accumulating or acquiring surplus funds for the purpose, and this surplus may be obtained by contributions thereto by stockholders as a part of their subscriptions to shares of stock, or from a group of stockholders. Of course, surplus earnings may be used for such working capital. An insurance company may make earnings from several sources, *e. g.* (1) by gains on mortality; (2) excess interest earnings; (3) margins on surrenders and lapses, each of which have a technical meaning, and may be calculated with reasonable certainty. These earnings must be reported to the Insurance Commissioner, and in a stock company using policies such as the Home Life Insurance Company of America issued, such earnings belong to the shareholders, ·and may be used to acquire new business. But as stated above, these sources do not provide sufficient money to obtain a rapid growth, and additional money is necessary and is usually obtainable by contributions or advances.

The Protective Company was organized as a holding company and to supply such surplus to the Insurance Company and did make contributions or advances from time to time aggregating about four hundred and seventy thousand dollars, of which about eighty thousand dollars had been repaid. In return for this financial help the Protective Company had an exclusive right to take at par the unissued stock of the Insurance Company; and the stockholders of the Insurance Company at the meeting in January, 1908, voted that all of its surplus be paid to the Protective Company for such "financing." Later the repayments were to be made only out of surplus in excess of ten thousand dollars, or in case of dissolution out of the assets of the Insurance Company as a debt. In substance, then, the Insurance Company obtained from the Protective Company money with which to acquire new business under an agreement to repay the money only from its surplus in excess of ten thousand dollars, except in case of its dissolution, when the moneys furnished were to be treated as a debt due from the Insurance Company to the Protective Company. Was this unlawful or unfair?

In simple terms, the question is whether an insurance company may lawfully make a contract by which it borrows money to be spent in acquiring new business and agree to repay the money only out of its surplus earnings, unless the company be dissolved, and then the money borrowed is to be treated as other debts of the company are treated? More broadly stated the question is, whether it is wrong for an insurance company to borrow money to be spent to acquire new business? There is but one rational answer to that query. It being shown that such a use of money by an insurance company was evidence of good business management, was like sowing seed for a future sure harvest, and there being no evidence of inefficiency in the expenditure of the money, it is not wrong for this insurance company to borrow money for such purpose. If properly spent the money brings in a crop of good business, and until the new business comes in the value of the company is increased by the expenditure which will bring in the profitable new business. It certainly is not wrong to borrow money for such purpose,

if the borrower is not obliged to repay it except from the profit he makes in the use of it. Such a borrower cannot be made insolvent because of the borrowing of the money, for he cannot be made to repay it unless he makes a profit from the use of it. The capital of the Insurance Company could not have been impaired by borrowing money for such purposes in such manner. As explained above, it could never be impaired if the debt is payable from surplus, which is net profit or earnings. Neither would it be impaired if payable generally, because for every dollar so spent for new business the value of the business would be increased to that extent; so that the volume of new business obtained from the use of the money so borrowed would be an asset and so balance the liability arising from the loan of the money. This seems a fundamentally sound and common sense proposition. Furthermore, the soundness of the proposition was apparently shown by the calculations as to the present liquidating value of the business of the company based on prices usually paid on sales of such a business. See Schedule C of Defendants' Exhibit No. 23 and statement and testimony of Huggins in relation thereto.

Therefore, if the above principles are sound, and they seem to be so, the plan by which the Protective Company advanced or loaned money to the Insurance Company to be used for the acquisition of new business and to be repaid with interest, only from surplus, or according to the later arrangement, only from surplus acquired by the Insurance Company in excess of ten thousand dollars, and not to be treated as a lien or debt due by the Insurance Company, except in case of its dissolution, was not invalid, fraudulent, oppressive, unfair, unreasonable, unwise, or objectionable in any way, so far as the Insurance Company and its stockholders were concerned. It would not have been objectionable if the money had been loaned to the Insurance Company by its president, or by its officers, or by its officers and directors, or by any of its stockholders. Nor would it be objectionable if made by another corporation the officers and directors of which are also the officers and directors of the Insurance Company, even if the lending company owned a majority of the shares of stock of the Insurance Company,

for the contract itself being unobjectionable it is quite unimportant as to the source from which the money is borrowed. Indeed, it would be more likely to be beneficial to the Insurance Company, and so to its stockholders, if the money was advanced by persons having an interest in it as stockholder or officer, for obviously the probability of its being used most efficiently and profitably is increased thereby.

In this case, then, the complainants cannot base any relief on the fact that the Protective Company advanced money to the Insurance Company to be used to acquire new business under a plan by which the Insurance Company agreed to repay the loans only out of its surplus in excess of ten thousand dollars and under an agreement that the moneys should not be treated as a debt except in case the Insurance Company be dissolved. Nor would the result be held different because the Protective Company had been given by the Insurance Company the exclusive right to take and pay for its unissued shares of stock at par, and so had secured a permanent power to control the Insurance Company. Neither the plan by which the Insurance Company was assisted financially, nor the method of executing it, was unfair or illegal, except as to the misrepresentations and concealments to be considered later.

It is contended strongly for the complainants that the plan of the Protective Company for financing the Insurance Company must have been unfair and unlawful because so many of the dealings between the two companies were misrepresented and concealed in the books of the Insurance Company and in its reports to the Insurance Commissioners, the books of the Insurance Company being kept by or under the direction of the same person or persons who kept the books of the Protective Company. It was shown that until 1913 advances were charged on the books of the Protective Company to the profit and loss account, which means that they were not considered as assets, or as debts to be repaid to the Protective Company. The books of the Insurance Company show no liability whatever, contingent or otherwise, to repay the moneys advanced, although they are shown on the books of the Protective Company since 1913 as an asset. In the reports to the Insurance

Commissioners the advances were not stated as liabilities, although the Insurance Company by law was called upon to state in the report all its liabilities. There were actual misrepresentations in these reports as to the source from which the advances were received, they being called "bonus on stock." Also misrepresentations as to the expenditures of the moneys so advanced, payments of interest being entered as cost of business purchased, or agents' balances and otherwise. These misrepresentations, concealments and irregularities of stating the dealings of the two corporations cannot be justified. If the plan of co-operation was considered fair and right, why conceal or misrepresent the transactions? The complainants insist that the purpose was fraud on the stockholders who were solicited to take shares. But this does not get very far if the plan be in fact innocent in its scope and purpose, and not unfair or unlawful. The deceptions, therefore do not give the complainants any right to relief, which is the only question before the court. Stockholders' rights are not affected by reason of the deceptions, and this court need not act for the Insurance Commissioner, unless requested to do so. It is quite immaterial, though interesting, that until the litigation started the officers and directors of the Insurance Company held few of its shares, while the same people were large holders of shares of the Protective Company.

There can be no real doubt that there is now a binding obligation by the Insurance Company to repay to the Protective Company the advances from surplus in excess of ten thousand dollars. Even if prior to 1915 the moneys received from the Protective Company by the Insurance Company were contributions or gifts, and so not to be repaid, and were advances or loans to be repaid, still after the action of the stockholders at the meeting held that year there was no doubt but that they constituted a debt to be repaid in the manner agreed upon.

Has the investment of the stockholders been jeopardized by the illegal payment of dividends and by an impairment of the capital stock? Each of these charges is grave and involves serious consequences if sustained by the evidence. The prayer of the bill on the subject is for an injunction to prevent the

272 Kingston, et al., vs. Home Life Ins. Co., et al.

Opinion.

officers of the Insurance Company from declaring or paying any dividend upon its stock except out of actual earnings. This may be granted without much consideration of the facts, because it would be but a declaration of the statute law of the State which permits dividends to be paid only out of surplus or net profits arising from the business of the company.

It is extremely difficult for anyone who has not had large experience in the practices and book-keeping theories of life insurance companies, or as an expert actuarial accountant, to decide what in a given case constitutes the surplus or net profits of the business of an insurance company. Some things seem clear, and one is that an estimated increase in the value of the building owned by the Insurance Company and occupied by its officers and employees, however accurately the increase be estimated, is not a net profit arising from the business of the company. If it is an investment of capital of the company its increased value when realized by a sale may perhaps be treated as a profit, but until realized it is surely unwise, inaccurate and wrong to so regard it and pay out money based on such an estimate, for it is only a guess, and if a correct one, when made it may become incorrect later when the conditions which produced the estimated increase of value change.

Again, a profit of the business of fifteen thousand dollars is not made if an officer of the company authorized to buy for the company with its money real estate for sixty thousand dollars buys it for forty-five thousand dollars. The assets of the company are not increased, and the saving is not a profit of the business which can be paid out in money as dividends.

The defendants undertook to show by an actuarial insurance expert that all the dividends declared were earned, and for this purpose a schedule with complicated calculations made for the purpose was submitted to prove the fact. The data of Schedule B of Defendants' Exhibit No. 23 were taken from the books of the two companies; but the basis of a very important part of the calculation was arbitrarily selected by the expert, and as there would be differences of opinion as to this selection, the whole calculation had little probative value. Taking the fundamental fact as shown by the schedule and not disputed

the income was less than disbursements, and the attempt to explain the resultant deficit was not convincing.

Assuming, then, that dividends were paid otherwise than out of the surplus or net profits of the business of the Insurance Company, what power has this court to give relief in this case by reason thereof? The statutory liability of those officers who declare the dividend could not be enforced against them in this cause, for they are not parties to it. An injunction against future unlawful payments would, of course, be made in general terms. But that was hardly the purpose of the bill. The illegal payment of the dividend would not of itself justify the appointment of a receiver. Such payments may be part of an unlawful plan, or be evidence of such gross incapacity, recklessness and fraud as to justify this court in taking the control and management of the company from its officers and directors for some useful purpose. But in this case the only purpose of a receivership would be a winding up and liquidation, for a receivership to carry on indefinitely the business of the company would be an intolerable suggestion, as was found by the court in *Carson v. Alleghany Window Glass Co., (C. C.)* 189 *Fed.* 791, 799.

If the complainants desire to pursue this branch of the case further by amendments to the prayers of the bill, it will probably be necessary to refer this branch of the case to an insurance expert as Master to consider the evidence and report thereon whether dividends have been declared otherwise than from the surplus or profits of the business of the Insurance Company. An opportunity will be given to counsel to be heard on this point before entering a decree.

Has there been an impairment of the capital of the Insurance Company? As evidence of the impairment of capital it is urged by the complainants that the value of the real estate in Philadelphia owned by the Insurance Company, and which is stated in its reports to be one hundred and eighty-three thousand dollars, is much exaggerated and should not be in excess of one hundred thousand dollars; that on December 31, 1915, the surplus as shown by the last report of the company made to the Insurance Commissioner was about twenty thou-

sand dollars; that if the real estate was overvalued more than twenty thousand dollars, the capital was impaired; and that if the advances by the Protective Company to the Insurance Company, aggregating about three hundred and sixty thousand dollars, constitute a debt, then the capital of the Insurance Company is entirely wiped out. From the testimony it is quite clear that the contention of the complainants on this point is correct. The value of the real estate was much too high as reported in the statements of the Insurance Company. Difficult as it is to estimate values even of real estate, it is surely unwise to value this property at one hundred and eighty-three thousand dollars, and it is certainly worth at least twenty thousand dollars less than that sum and nearer one hundred thousand dollars than one hundred and eighty-three thousand dollars. The extent of the impairment of capital is not important here. But it does not follow that this court should for that reason now wind up the affairs of the company by a receivership. The statutes of the State give to the Insurance Commissioner large powers and impose upon him important duties respecting the conduct of business of insurance companies doing business here. The question of the impairment of capital is peculiarly for his consideration, as also would it be his duty to decide what the consequences thereof would be, and this court should not act so as to interfere with his official disposition of the facts—certainly not in advance of his acting or refusing to act. There is, however, no intention of disclaiming the jurisdiction of this court by declining at this time to exercise it.

It is a notable fact, apparently established by the testimony of the actuarial expert, that the liquidating value of the business of the Insurance Company is sufficient to repay the Protective Company all their advances and still make the net value of each share of the Insurance Company from about twenty-two dollars to twenty-four dollars per share, the par value being ten dollars. See Schedule C of Defendant's Exhibit No. 23. There are other signs that the connection of the two companies has been beneficial rather than detrimental. This may not of itself be an answer to all the charges made in the bill, but may fairly influence judicial discretion as to remedies.

Should the Walsh contract be annulled? It was claimed by the complainants that Basil S. Walsh, the president of the company, obtained from the company in 1905 a contract concerning commissions which was unfair to the company, and that in the report to the Insurance Commissioner this was concealed. It is true that when called upon to state in the report whether any of the officers of the company were paid commissions, Walsh under oath answered in the negative. His explanation is that the contract had so far been unprofitable and for that reason he thought he was answering correctly. But this is not a satisfactory explanation. He assumed as worth its face value a certain worthless account owing to the Insurance Company, and by reason thereof the company was able to make a better showing in its reports to the Insurance Commissioner. In consideration of the assumption of the worthless account Walsh receives a very large part of the premiums on commissions. It does not appear that the company is any better off by reason of the contract, and on the other hand it does not seem so grossly unfair to the company as to justify action by this court to annul it, if the court has a right to do so. Mr. Walsh has in his testimony offered to surrender his contract if it is considered unfair. But his deceptive statement in the report is apparently the worst feature of the matter. By the testimony he did not vote on the motion when the board of directors decided to accept his proposition, and there appears to be no breach of the trust arising from his official position in his dealings with the company. Certainly the making of the contract does not justify the appointment of a receiver of the company for any purpose, and there is no special prayer for relief as to the contract.

On the whole, then, notwithstanding the deceptions, concealments and misstatements in the book-keeping and reports to the Insurance Commissioner; and though dividends may have been declared other than from surplus or net profits of the business of the company; and even though the capital of the company may in a sense have been impaired; still neither one nor all of these misdeeds, indefensible and as reprehensible as they are, justify this court in taking action against the company,

such as is sought, or any other. Some of the ills are righted by exposure, others may be righted by the Insurance Commissioner, and all of them together do not warrant a court in taking the administration of the affairs of the company from the hands of its officers.

Having determined that the stock option was not invalid, and that the arrangement by which the Protective Company advanced money to the Insurance Company was not illegal or unfair, there is no relief which this court can grant to the complainants, except an injunction against declaring dividends except out of surplus or net profits.

It should be commented that the books and papers of both defendant companies have been voluntarily laid open to full inspection by the complainants.

Unless, therefore, the complainants be given some relief based on the payment of dividends, the dismissal of the bill would follow.

Inasmuch as the concealments and deceptions in the reports made by the Insurance Company were probably largely responsible for litigation, a part at least of the costs should be put on the two defendants, for the identity of their managers imposes on each of them a responsibility for the situation.

*Note:* The decree of the Chancellor was affirmed by the Supreme Court at the June Term 1918. See *post p.* 428.