**WYLES v. CAMPBELL et al.**

Civil Action No. 1014.

District Court, D. Delaware.
March 31, 1948.

Arthur G. Logan, of Logan, Duffy & Boggs, all of Wilmington, Del., for plaintiff.

Caleb S. Layton, of Richards, Layton & Finger, all of Wilmington, Del., and Everett I. Willis, of Root, Ballantine, Harlan, Bushby & Palmer, all of New York City, for defendants.

RODNEY, District Judge.

This is a stockholder's derivative suit filed by the plaintiff, a stockholder of The

Valspar Corporation, seeking to cancel and invalidate some 26,000 shares of common stock of such corporate defendant issued by it to the individual defendant. Jurisdiction is based upon diversity of citizenship.

The complaint alleges that the plaintiff is the owner of 1213 shares of common stock of Valspar and has been such owner at all times since before the actions of which he complains. Pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, the complaint sets forth the reasons for the failure to obtain appropriate action directly by the corporate defendant and the reasons for institution of the derivative suit and complies with the other requirements of such rule.

The stock which is sought to be cancelled was issued by Valspar to Campbell pursuant to a purported option included in an employment agreement dated December 1, 1942. The option appears to have been exercised on December 30, 1946 and the stock then issued for the consideration of $1.00 per share, whereas the market value of such stock at the time was $11.125 per share. While findings of fact and conclusions of law are separately filed, some statement of the facts is deemed here necessary.

While the exercise of the option and the issuance of the shares was had pursuant to the terms of the employment contract of December 1, 1942, yet since that contract in terms related to and purported to continue a former contract, so it would seem proper to follow the relations of the parties in chronological order so that the respective contentions may more clearly appear.

In 1935 Valspar Corporation was in serious financial difficulty. It had lost $4,500,-000 in the preceding six years. It had a debt of $2,436,300 and its preferred stock had a liquidating value and arrearage of dividends amounting to $3,473,124. The company had only a tangible net worth of $553,740 over its debt capital. It had pledged its accounts receivable and had little or no credit.

Under these circumstances the management of the Valspar Corporation made an extensive search for a new executive and fixed upon Mr. Campbell, the individual defendant, who was reported to have made an outstanding success in the management of another paint company under somewhat similar conditions. Valspar had been paying its executive $35,000 per year, but Mr. Campbell was unwilling to come to Valspar unless he should have some opportunity to acquire a stock interest in the corporation in case of his success in its operation.

On October 2, 1935, an employment contract was executed by Valspar Corporation and each of its four wholly owned subsidiaries on the one part and Thurlow J. Campbell, the individual defendant, on the other part. The contract called for a two-year period beginning October 9, 1935. It provided for a salary of $30,000 per year and certain details of management. In detailed and explicit terms the contract provided: "As further consideration for his agreement to undertake the employment," Campbell, upon the existence on October 9, 1937, of certain conditions (now immaterial) should have an option at any time within 60 days after October 9, 1937 to purchase 20,000 shares of common stock of Valspar at $1.00 per share. Indeed, the provisions as to the option to purchase stock by Campbell constitute the major part of the physical content of the agreement. The contract provided that if Campbell should continue in the employ of Valspar after October 9, 1937, the option should be extended throughout the period of continued employment and could be exercised at any time during such period, but in no event after or beyond October 9, 1939. The contract provided that if the outstanding common stock of Valspar should, in various detailed ways, be increased or diminished, then the amount of stock represented by the option should correspondingly be increased or diminished, presumably so that the proportion of shares represented by the option be retained. The option of Campbell to purchase the stock was wholly personal to him and not subject to any alienation or assignment of any kind, except that certain provisions governed the eventuality of his death at certain specified times. Pursuant to the terms of the contract of October 2, 1935 Campbell entered into the employ of Valspar and its subsidiaries. On January 8, 1937 and May 19, 1937, certain minor and

now immaterial amendments were made to the original contract.

From October 9, 1937, to November 30, 1937, an understanding existed that the relations between the parties would continue on a month-to-month basis and under the terms and conditions of the original agreement of October 2, 1935, except that the salary of Campbell as manager should be at the rate of $35,000 instead of $30,000.

On December 1, 1937 the parties entered into a further written agreement. It expressly provided that the original agreement of October 2, 1935 (as amended) should continue in full force and effect except as therein specifically provided. It extended the term of employment of Campbell to November 30, 1942. It provided for a salary from December 1, 1937, to November 30, 1939, at the rate of $35,000 per year and from December 1, 1939, to November 30, 1942, at the rate of $40,000 per year. It provided for certain additional payments where the consolidated net profits reached certain figures, viz., during the years from December 1, 1937, to November 30, 1939, an amount equal to 5% of the amount by which the consolidated net profit exceeded $300,000; during the period of December 1, 1939, to November 30, 1940, the same percentage after a net profit exceeding $350,000; and from December 1, 1940, to November 30, 1942 where the net profit exceeded $375,000. The agreement of December 1, 1937 provided "as a further consideration for the agreement of the manager to continue his employment as herein provided, the option to the manager set forth in paragraph 5 of the original agreement is hereby extended and may be exercised by the manager at any time during, but only during, the period of his continued employment hereunder." The option here mentioned was the option to purchase stock. Under the terms of the agreement of December 1, 1937, extending the terms of the original agreement, Mr. Campbell continued in the employ of Valspar Corporation and its subsidiaries.

During the year 1938 the capital structure of Valspar was substantially changed. This change is here material because by it the number of outstanding shares of common stock was altered and increased and their value affected, and so this change has an effect upon the option of Campbell to purchase common stock as both hereinbefore and hereinafter considered.

In 1938 the Valspar Corporation had outstanding 30,444 shares of $6 dividend cumulative preferred stock on which, as of February 1, 1938, there were accrued and unpaid dividends of $821,988, and there were outstanding 233,122 shares of common stock. By the reorganization the $6 preferred stock and accumulated and unpaid dividends thereon could be surrendered and each share receive in substitution therefor one share of $4 preferred stock and 5 shares of common stock. The outstanding common stock was thus subject to be increased by 152,220 shares.

At a Directors' meeting on December 16, 1942, the secretary called attention to the fact that the contract of employment of Campbell as president and general manager had expired on November 30, 1942, and a committee was appointed to "negotiate on behalf of the corporation the new contract of employment with Mr. Campbell."

On January 27, 1943, the committee submitted the form of the new contract with Mr. Campbell dated as of December 1, 1942 which was approved by the Board of Directors subject to the advice of counsel and subject to the consultation with the auditors as to the basis of calculation of net profit and two directors were authorized to execute the final draft. It may parenthetically be stated that neither at this meeting or at any meeting with relation to the stock option did Mr. Campbell as a director or officer participate in the voting.

The contract of December 1, 1942, was duly executed. It recited the "original agreement" of October 2, 1935 (as amended), and provided that it be "further amended and the term of employment of the manager and the term for the exercise of the option therein set forth are hereby respectively extended and the number of shares covering said option is increased as follows :"

1. The term of employment is extended to November 30, 1947.

2. The annual salary shall be $40,000 and there shall be a bonus of 5% of the

amount by which the consolidated net profit should exceed $375,000.

3. "The option to the manager set forth in paragraph 5 of the original agreement is hereby extended and may be exercised by the manager at any time during, but only during, the period of his continued employment hereunder and the number of shares covered by such option is hereby increased from an aggregate of 20,000 shares to 26,000 shares."

From the testimony it appears that the increase of shares covered by the option from 20,000 to 26,000 was a matter of compromise. It was stated that under the terms of the original agreement the number of shares covered by the option would be increased proportionately as the common stock outstanding was increased and that the increase of common stock by the recapitalization of 1938 would normally result in an increase of shares covered by the option of about 13,000 shares. Regard was given, however, to the increased value of the common stock by the capitalization of the accumulated dividends on the preferred stock and by the reduction of the dividend rate on the new preferred stock from 6% to 4% and the increase of 6,000 shares covered by the option then resulted by agreement.

Disconnected with the inception of Campbell's option to buy the stock, or of any extension or renewal of such option, but allegedly having a bearing upon the exercise of such option are certain facts relied upon by the plaintiff.

In the Spring of 1945 one Thomas A. Bruder began to acquire stock holdings in the Valspar Corporation and so continued until he and his family became the largest individual holders of such stock. Mr. Bruder indicated dissatisfaction with the management of Valspar and attempted to obtain a stockholders' list for proxy purposes but failed in such effort until after the annual meeting of stockholders in 1946. Mr. Bruder continued his purchases of stock in 1946 and on December 30, 1946, and prior to the annual meeting of 1947, Mr. Campbell exercised his option to purchase the 26,000 shares of common stock as set out in the employment contract. Upon these and related facts rests the contention of the plain-

tiff that the exercise of the option by Campbell was for an improper purpose. The plaintiff contends:

1. That the purported option to purchase shares in the contract of December 1, 1942, was invalid and without consideration and the shares issued pursuant thereto were invalidly issued.

2. That the value of the shares had so increased between the date of the purported option and the exercising of such option that the exercise of such option was inequitable to other stockholders.

3. That the purported exercise of the option was for an improper purpose, namely, for the purpose of maintaining control of the Valspar Corporation.

The defendants on the other hand contend:

1. That the option was a valid and binding obligation of the corporation based upon a valid consideration and agreed to by an independent Board of Directors in the exercise of their honest business judgment as to the best interests of Valspar Corporation.

2. That the increase in value of the common stock under Mr. Campbell's management as evidence of the success of the corporation was the very purpose of the option and did not impair the validity of the incentive contract.

3. That there is no factual or legal basis for the contention that the option was exercised or the stock issued for an improper purpose.

4. That the plaintiff is barred by laches.

These contentions will be considered in their order.

 The legal questions here pertinent are reasonably clear and established and only their application is open to question. There can be little doubt that a board of directors cannot make a gift of funds of the corporation to the corporate officers or other persons. It is equally clear that, except under unusual circumstances, a board of directors has no power to apply the assets of a corporation to the officers thereof for past services already rendered for a prescribed compensation. It is also abundantly supported by authority that where cor-

porate funds are applied to incentive or other compensation of corporate officers, such remuneration must bear a reasonable relation to the value of the services for which the funds are applied.

Extensive citations in support of these principles will not be indulged in. It is sufficient to refer to Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385, 88 A.L.R. 744, and draw attention to the many cases collected in the annotations in 40 A.L.R. 1423, 88 A.L.R. 751 and 164 A.L.R. 1125.

With these general principles in mind we can consider the basic background for the issuance of the shares and the contentions of the parties.

1. As to the validity of the option under the 1942 contract. While the precise difficulties arise under the contract of December 1, 1942, yet, since it is contended that this contract was a continuation of the former contracts, consideration will begin with the contract of October 2, 1935.

No objection is made to the validity of the contract of October 2, 1935. It was clearly a contract for the future services and the salary and option to purchase stock were explicitly stated to be considerations for those services. In one respect the contract of October 2, 1935, differed with respect to the option to purchase stock from the two subsequent renewals or extensions. It covered the period of two years, from October 9, 1935, to October 9, 1937. It permitted the exercise of the option to purchase stock for 60 days after October 9, 1937, even though Campbell had then left the employ of the company. The later agreements were somewhat more limited and expressly provided that the option could only be exercised while Campbell remained in the employ of the company.

No objection is made to the validity of the contract of December 1, 1937. It expressly adopted and extended the provisions of the earlier contract of October 2, 1935. Insofar as the option to purchase stock is concerned, it expressly extended the period of the option during the extended term of employment under that contract, or to November 30, 1942. This extension was expressly stated to be "in further considera-tion for the agreement of the manager to continue his employment as herein provided."

We thus come to the contract of December 1, 1942. It again adopts and extends the provisions of the 1935 agreement except as therein altered. It again extends the option to purchase stock as the agreement of 1937 had done. In providing for the monetary payments of salary it uses the words "as full compensation," but these were precisely the same words as used in the same sense in the former contracts. The contract of 1942 omits the language of the former agreements where they, with reference to the option to purchase stock, recite the option "as further consideration for the agreement of the manager to [undertake or continue] his employment."

The plaintiff seizes upon this omission and upon it rests much of the basis of his contention as to this phase of the case. The plaintiff contends that there was no obligation for Campbell to continue his service and that without such obligation the option lacked consideration and became a mere gift for past services and therefore invalid.

The defendants contend that under the agreement of 1942 Campbell was definitely committed to remain in the employ of Valspar for the period fixed by the contract and that such commitment entered into the consideration for the option. They contend that the renewed recital of such consideration of continuing service was unnecessary and that "consideration furnished by one party is presumed to support all the covenants of the adversary party unless it is expressly apportioned to less than all." [1]

It is in evidence that, without the inclusion of the option to purchase stock in the 1942 contract, Campbell would not have continued in the employ of the company.

I have little difficulty in finding the obligation of Campbell to continue in the employ of the company under the 1942 contract. The 1935 agreement recited that Valspar desired to engage the services of Campbell and that Campbell "desires to accept such engagements;" and that Valspar and its subsidiaries "hereby severally employ the manager [Campbell] as its gen-

---

[1] 1 Page on Contracts, 2d Ed., Sec. 525.

eral manager and the manager accepts such engagement." The 1942 agreement adopted the provisions of the 1935 agreement except as therein altered and expressly provided that Campbell "should devote his entire time and energy faithfully and to the best of his ability to the business and affairs of Valspar and its subsidiaries. * * *"

The plaintiff finds in this expression a mere pledge of loyalty with no duration of time for the exercise of that loyalty. I find a pledge of loyalty during the period of his engagement, viz., the duration of the contract, and that such duty is continued under the subsequent agreements. Even though a written contract for personal service may not be specifically performed,[2] a mutuality of obligation does exist under such contract. Just as an employer is under obligation to pay the agreed compensation for the period of the express contract, so the employee is under contractual obligation to serve during that same period. As stated by Justice Harlan in Arthur v. Oakes, 7 Cir., 1894, 63 F. 310, 318, 25 L.R.A. 414, "The right of an employe engaged to perform personal service to quit that service rests upon the same basis as the right of an employer to discharge him from further personal service. If the quitting in the one case or the discharging in the other is in violation of the contract between the parties, the one injured by the breach has his action for damages * * *" and "if an employe quits without cause, and in violation of an express contract to serve for a stated time, then his quitting would not be of right, and he would be liable for any damages resulting from a breach of his agreement * * *." As a textbook[3] states the rule, "The primary duty which a contract of hiring imposes on [an employee] is to remain subject to the orders of his [employer] and ready to perform the agreed work during the whole of the term covered by the contract. If before the end of that period he departs from the employment without a valid reason, he renders himself liable according to all the authorities for any damages which the [employer] may sustain in consequence of his departure."

■ A formal and written employment contract signed by both parties and contemplating, by both, employment for a definite term of five years and obligating the employer to pay compensation for that term implies the obligation of service by the employee for the full term for which he may claim compensation. American Distributing Co. v. Hayes Wheel Co., D.C.Mich.1918, 250 F. 109, 115, reversed on other grounds, 6 Cir., 257 F. 881, certiorari denied 250 U.S. 672, 40 S.Ct. 13, 63 L.Ed. 1200; Black v. Woodrow, 1873, 39 Md. 194, 215; Baltimore Breweries Co, v. Callahan, 1895, 82 Md. 106, 33 A. 460.

■ Insofar as the extension of the option to purchase stock under the agreement of December 1, 1942, concerned the question of consideration, I find such consideration existed and the option not invalid on that ground.

■ 2. The plaintiff contends that the increase in market value of the stock of Valspar between the time of the granting of the option by Valspar and the time of its exercise by Campbell makes the exercise of the option so inequitable that the option must be deemed to have terminated.

A somewhat similar question was posed in a dictum by the Supreme Court of Delaware in a matter not then directly pending and as to which it reached no conclusion.[4] The Kingston case, as determined by the Chancellor in the court below,[5] considered an unlimited option to purchase all of the stock of a company at a stated figure. The Chancellor stated, "The right to take at par stock which was salable at more than par did not necessarily invalidate the option; that would depend on circumstances. It might be so inequitable, oppressive, or unjust as to shock the conscience of the court, or be fraudulent or without consideration. * * *" The Chancellor sustained the validity of the option and the Supreme Court affirmed the Chancellor. The King-

---

[2] See cases cited in annotation 135 A. L.R. 279.

[3] 1 Labatt, Master and Servant, 2d Ed., Sec. 268.

[4] Kingston et al. v. Home Life Insurance Co. of America, 11 Del.Ch. 428, 104 A. 25.

[5] 11 Del.Ch. 258, 101 A. 898, 901.

ston case, however, has little relevancy here because of the wide divergence of the facts. In the Kingston case there was no incentive contract for personal services such as is present here. In the cited case the option was unrestricted as to time, unlimited as to the amount of stock covered by the option and there was no obligation on the optionee to purchase the stock, perform services or furnish any other consideration. In the instant case the option was for a limited term and exercisable only while Campbell was in the employ of Valspar, it covered only about 6% of the stock, and the option was directly connected with the obligation and consideration of personal services. Other divergences of fact make further consideration of the Kingston case seem somewhat fruitless.

Using the language of Chancellor Curtis as above quoted,[6] it would seem to be material to see whether the option here can be said to be "so inequitable, oppressive, or unjust as to shock the conscience of the court, or be fraudulent or without consideration." There is no suggestion or contention that the option was conceived or executed in fraud and I have found that it was not given or exercised without adequate consideration. There then remains only the question as to whether the exercise of the option was so unconscionable or inequitable that the option must be deemed to have terminated.

It is at this point that reference must be made again to the legal principle hereinbefore mentioned, viz., that the application of corporate funds to incentive or other contracts of the corporate officers must bear reasonable relation to the value of the services for which the funds are applied. The principle is well supported by the authorities hereinbefore cited and its application may be considered in connection with other legal principles as well as dependent upon factual considerations. It is well established in Delaware and by the general law that normally and in the absence of unusual circumstances the ordinary business affairs of a corporation as determined by the board of directors will not be interfered with by the courts. The judgment of the directors upon a question of policy and business management untainted with fraud will be accepted as final. Bodell v. General Gas and Electric Corporation, Del.Sup.Ct. 1927, 15 Del. Ch. 420, 140 A. 264; Karasik v. Pacific Eastern Corporation, 1935, 21 Del. Ch. 81, 180 A. 604; Davis v. Louisville Gas and Elec. Co., 1928, 16 Del. Ch. 157, 142 A. 654, cited with approval in Nemser v. Aviation Corporation, D.C.Del.1942, 47 F.Supp. 515; Clamitz v. Thatcher Manufacturing Co., 2 Cir., 1947, 158 F.2d 687; McQuillen v. National Cash Register Company, D.C.Md.1939, 27 F.Supp. 639; Wight v. Heublein, D.C.Md., 1917, 238 F. 321, 324; Abrams v. Allen, Sup., 36 N.Y.S.2d 174.

In a consideration of the reasonableness of the option to purchase stock it would seem appropriate to consider the option to purchase stock as originally given in 1935 and exercisable in 1937. Detailed consideration of the precarious financial condition of Valspar in 1935 has been given. It has been shown that in 1935 the directors of Valspar, fearing receivership or insolvency proceedings, searched for a competent executive to bring financial improvement and settled upon Mr. Campbell. As a condition of his employment the option to purchase stock at par was granted, the number of shares being limited to 20,000, or if the capitalization was changed, then such number of additional shares so that the option might bear the same relation to the new capitalization. When the contracts were renewed in 1937 and 1942, each for a 5-year term, the same options to purchase stock were also renewed or continued.

In Harker v. Ralston-Purina Co., 7 Cir., 1931, 45 F.2d 929, certiorari denied 284 U.S. 619, 52 S.Ct. 7, 76 L.Ed. 528, a corporation contracted for the future services of an employee for five years and in consideration thereof agreed to sell him some stock at less than market value. The court held the agreement valid.

In Clamitz v. Thatcher Manufacturing Co., supra, options granted to executives were upheld even though the optionees were not obligated to continue in the employ of

---

[6] 11 Del.Ch. 258, 264, 101 A. 898.

the company for any definite period and where the price of the stock had risen from $10.00 (the option price) to $19.00 between the giving of the option and the exercise of such option.

The present case is strikingly similar to Abrams v. Allen, Sup., 36 N.Y.S.2d 174, affirmed without opinion, 266 App.Div. 835, 42 N.Y.S.2d 641, motion for leave to appeal to Court of Appeals or for a reargument denied, 266 App.Div. 948, 44 N.Y.S.2d 337. In that case Remington Rand Co. had been losing money at the rate of $3,000,000 a year and its stock was selling at $1.50 a share. In 1932 one Rand agreed to serve as manager for three years and as part of his contract was given a five-year option to purchase 100,000 shares of stock at $10.00 per share. By 1937 the operations of the company showed an annual profit of $3,500,000 and the stock was selling at $28.50 per share. The court sustained the validity of the option and its exercise by Rand.

An incentive contract may be considered as one by which a corporation may obtain or continue the services of a desired employee by offering him some compensation in addition to a fixed monetary salary. It is intended to give to the prospective or continuing employee an incentive to come to or remain with the company itself and to reap some reward from the success of the company and of his services to it which is the expectation of the contract. This additional incentive compensation for future services may be in the form of additional monetary grant or a reasonable contingent grant with relation to profits or a reasonable stock interest. Unless such contracts are unenforceable in themselves, then in this case we only need consider the number of shares in the option to purchase and the purchase price thereof.

■ As bearing upon the supposed inequity of allowing the option to be executed and as bearing upon the action of the directors, some very limited observations may be made. The stock had a market value in October, 1935 when the original option first was given of between twenty-five cents and fifty cents per share. From that time until 1946 the market value was quite vari-able. In December 1942 when the latest option, now objected to, was renewed, the stock had a market value of from fifty cents to fifty-six cents a share. In 1943 it averaged a price of from $1 to $1.50 and in 1944 around $2. In 1945 it averaged around $5.00 per share and in 1946 advanced in price to $10 or $11. If, as I have held, the option was valid when entered into in 1942, it is difficult to assign a particular date within the explicit term of five years when the exercise of the option would have to be made in order to be entirely free from any taint of unreasonableness. If the option was perfectly valid when given it would be difficult for this court to fix a precise market value which the stock might attain within the definite term as an ultimate limit and constitute the exact boundary line between a valid and an invalid exercise of such option. The advance in value of the shares was clearly the hope and expectation of all the parties and such advance cannot, of and by itself, and under the present circumstances, make the exercise of the option invalid.

The same result is reached upon a consideration of the total advance in the value of the stock. It is pointed out by the plaintiff that the par value of the stock was $1 per share and that the stock increased in market value from 56¢ in December, 1942, to $11 in December, 1946, when the option was exercised at par value. From this it is argued that the advance in values represented a profit of $10.00 a share on the 26,000 shares covered by the option or a total profit to Campbell of $260,000. It may be remarked, however, that the 26,000 shares were merely a part of an authorized issue of 800,000 shares and that the market value of each share increased in the same proportion resulting in an increase in valuation of the stock of the company of $8,000,-000, if we could assume that each share could be sold at the market price which, of course, could not be accomplished. It cannot be said that this increase in market value was entirely due to the value of the services of Mr. Campbell. The most that can be said is that the value of those services operating upon an improved economy of the country brought about this increase in value. This result seems, however, to

have been the very thought behind the granting of the option and to have been the result hoped for by the management of the corporation.

If the option to purchase the stock was valid when the extension was granted in 1942, the failure to exercise it at any particular date or earlier time than December, 1946 merely withheld from the company the right and opportunity to use the proceeds of the option or the use of the sum of $26,000 from the time the option was exercised. This would seem to be the total extent of the interest of the company brought about by the delay in executing the option.

I do not find the issuance of the shares pursuant to the option invalid because of the advanced value of the shares.

3. It is contended by the plaintiff that the option to purchase the stock in question was exercised by Campbell to accomplish an improper purpose, viz., to maintain control of Valspar, and therefore that the stock should be cancelled. The plaintiff contends that while Campbell could have exercised the option to purchase the stock after 1937, yet such option was not exercised until December 30, 1946, after one Thomas A. Bruder had conducted an active proxy campaign to oust the management of Valspar and therefore the issuance of stock was improper. In support of his contention the plaintiff places main reliance upon three Delaware cases.[7]

The correctness of the principle that "corporate shares may not be issued for an improper purpose, as for instance to maintain control of the corporation" as baldly stated in the Kingston case and as an abstract principle and when accompanied by pertinent facts may be readily admitted. In one of the cases cited in the note and the only one in which the issue was held invalid, the directors issued to themselves 51% of the stock of the company without any consideration therefor and merely to retain control of the corporation. The correctness of the principle under such circumstances seems clear. In the present case there is neither factual nor legal basis for the application of the principle. Here Campbell had a valid option to purchase the stock based upon a legal and sufficient consideration and the option was exercised within the term during which it was exercisable.

There is ample testimony that, at an earlier date in 1944 and before Bruder had any connection with or attempted to gain control of Valspar, Campbell had intended to exercise the option but was then deterred therefrom by impending questions of taxation. It is in evidence that the exercise of the option was postponed until these questions of taxation had been adjusted. This explanation is not evidentially denied.

The shares of stock cannot be cancelled upon the mere ground that their issuance would have a tendency to carry control of the corporation unless the mere statement of that result of and by itself and unaccompanied by other facts would make the issuance invalid. This I think cannot be true.

I am of the opinion that the exercise of the option to purchase the stock as exercised by Campbell was valid and it therefore becomes unnecessary to consider the questions of laches in the filing of the complaint or acquiescence of the plaintiff.

In this case I have arrived at the conclusion that the defendants must prevail upon the merits. No question having been raised as to the propriety of a suit in this jurisdiction by Valspar Corporation, a corporation of Delaware, against Campbell, a citizen of New York, and the consequent effect upon the derivative rights of Wyles, the complainant, I have herein given no consideration to such question. See Schoen v. Mountain Producers Corporation, D.C. Del.1948, 76 F.Supp. 554; Malcolm v. MacDonald, D.C.Del.1941, 37 F.Supp. 580.

An appropriate decree may be submitted.

[7] Kingston et al. v. Home Life Insurance Co. of America, 11 Del.Ch. 258, 264, 101 A. 898; Bowen v. Imperial Theatres, Inc., 13 Del.Ch. 120, 115 A. 918; Yasik v. Wachtel, 25 Del.Ch. 247, 17 A.2d 309.