PORTER v. BEHA, Superintendent of Insurance, et al.

(Circuit Court of Appeals, Second Circuit. May 17, 1926.)

No. 305.

1. Insurance ☜50—Neither state superintendent of insurance, who demanded that insurance company raise $40,000 to avoid immediate liquidation, and who accepted proceeds of stolen bonds, nor company, held holders for value, and owner of bonds was entitled to recover proceeds from superintendent; "consideration" (Negotiable Instruments Law [Consol. Laws N. Y. c. 38]).

Where person controlling insurance company, on demand of state superintendent of insurance that company raise $40,000 to avoid immediate liquidation, offered to turn over

12 F.(2d)—33

stolen bonds, which superintendent refused to accept because ·of suspicion that they were stolen, but required them to be sold and proceeds turned over, *held*, that there was no consideration for transfer of proceeds, and neither insurance department nor company was entitled to protection of Negotiable Instruments Law (Consol. Laws N. Y. c. 38) as holder for value, and receiver of bank from which bonds were stolen was entitled to recover such proceeds in hands of superintendent; "consideration" signifying price which is of value to obligor and detriment to obligee, a benefit to promisor or loss to promisee.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Consideration.]

2. Contracts ☜50.
Consideration cannot exist without a contract.

3. Courts ☜365.
Federal courts must themselves decide on their own jurisdiction, and decisions of state courts are not controlling.

4. States ☜191(2)—Immunity of state from suit does not prevent suit against state superintendent of insurance to impress lien on property in his official hands, and which does not belong to state.

Immunity of state from suit does not prevent suit against state superintendent of insurance to impress lien on property in his official hands, and which does not belong to state, where decree will not require doing of any affirmative act affecting state's political or property rights.

Appeal from the District Court of the United States for the Northern District of New York.

Suit by James M. Porter, as receiver for the First National Bank of Warren, Mass., against James A. Beha, as Superintendent of Insurance of the State of New York, and others. Decree for plaintiff (8 F.[2d] 65), and defendants appeal. Affirmed.

Plaintiff appellee is a receiver appointed under the authority of the Secretary of the Treasury for the First National Bank of Warren, Mass. Defendant is the superintendent of insurance of New York, an appointive official of that state, whose duty and authority extend to the examination of New York insurance companies and the liquidation of the business of any company becoming (inter alia) insolvent. Mr. Beha is the successor in office of the superintendent functioning when the events producing this suit occurred, and when subpœna issued.

Niagara Life Insurance Company was a corporation of New York, with headquarters in Buffalo, and one Marcino, a man of several aliases, who seems to have been an expert in going from one part of the country

to another, and in each region obtaining control of some financial concern, and wrecking it for his own profit; i. e., doing what the public, perhaps not with legal accuracy, calls stealing its assets. The bank for which plaintiff is receiver was a small institution, in which Marcino became sufficiently influential during January, 1923, to gain access to its vaults. In May, 1922, he had become able to control the directorate and management of Niagara Company, and later he added to his list of subservient corporations a state chartered institution of Pennsylvania, the Mechanics' & Merchants' Bank of Philadelphia.

Marcino's control of Niagara Company resulted before February 1, 1923, in the transfer of much of the company's cash from Buffalo banks to this Philadelphia bank. This was known before February 1st to the superintendent of insurance or his representatives personally present in Buffalo, who under the large powers given by the statutes had before the date mentioned forbidden Niagara Company to issue any checks (at least large ones) unless an examiner of the department initialed the same. Although by January, 1923, the insurance department looked doubtfully on Marcino, and suspected him of much, but of nothing that could be definitely given a name, the Niagara Company had for years been regarded as unworthy of confidence; on more than one occasion its capital or reserve had been found impaired, and the deficiency had been made good by some scheme of assessment not revealed in this record.

In the summer of 1922 rumors came to persons in Buffalo, interested in Niagara Company and not in any way identified with Marcino, that the latter had under another name "looted" a bank or banks on the Pacific Coast, after purchasing an interest therein. These persons, or some of them, charged Marcino with this to his face; but he repelled the accusation, and photographs of him were not recognized by some Californians who had known the wrongdoer in that state. Upon the whole the rumors which had accompanied Marcino when he appeared in Buffalo had not been justified, and in January, 1923, there was no *fact* known about him that justified any attack on his honesty; but it is plain that the insurance department and others kept on suspecting him, so much so that on January 31, 1923, one of the department's representatives went to Philadelphia, and through the Pennsylvania banking department attempted to find out the situation of the Mechanics' & Merchants' Bank. The usual official lethargy was encountered, but by February 5th the New York superintendent knew that the bank itself was new and weak, that its deposits were small, and that large amounts (though not an amount quite as large as Niagara Company's account) had been loaned to men either unidentifiable or related to Marcino, substantially without security.

This greatly alarmed the New York officials, who at once demanded of Marcino the production of $40,000 or thereabouts wherewith to strengthen the Niagara Company, declaring that, if this were not done, they would at once take possession under the statutes. Marcino's father-in-law, one Goldman, appeared at this point; the superintendent's representative thought best to go with Goldman to Chicago, where the latter lived, in the hope of getting from him, or through him, quick assets of the desired amount. He got nothing, believed that he had been deliberately lied to, and assigned to the list of falsehoods a statement of Goldman's wife that she "had sent the certificates to Joe" (Marcino). This was said as an excuse for not producing salable and valuable securities. Result was that on the morning of February 7th this deputy superintendent was back in Buffalo, confident he had been deceived, when he was waited on at breakfast by representatives of the Niagara Company, who said "Marcino has got the bonds." The deputy says he then believed that Mrs. Goldman had probably not lied, and that the bonds had come from Chicago.

On this day Niagara Company was already by order to show cause under injunction from doing business, but the acts of February 7th were specifically authorized by the superintendent, notwithstanding the injunction he had himself procured. Marcino and representatives of the Niagara Company and insurance department repaired together to a broker's office, where Marcino produced bonds worth at par $41,-000, which were sold on the New York Stock Exchange by wire, and the brokers at once gave their check for the net proceeds, $39,130.08 to the order of Niagara Company. Going then to Niagara Company, Marcino received a certificate of deposit for $25,-000, issued by Mechanics' & Merchants' Bank, and a check signed by Niagara Company on the same bank for $14,130.08.

Thus the net result of that morning's work on February 7th was that Niagara Company, now fully under the control of superintendent of insurance, had substitut-

ed for $39,130.08 of credits in the very justly suspected Philadelphia bank the same amount deposited in a Buffalo bank of approved repute. The motives of the insurance department in this matter were summed up in a remark by the deputy superintendent on the conclusion thereof: This "puts the company in such financial condition that it can be reinsured now, whatever happens." There were over 6,000 life policy holders, and the department at once began, if it had not begun before, to seek a reinsurer, while maintaining the status quo of the company by means of the injunction. The technical statutory reason for taking over and liquidating the Niagara Company was that, even after the acquisition of the proceeds of the bonds, there existed an impairment of capital of over $100,000.

In point of fact, the bonds sold in Buffalo on February 7th were part of some $200,000 worth of securities substantially stolen by Marcino from the Warren National Bank a day or so earlier. The fact of this theft was not known in Warren until February 19th, and on February 23d, when the show cause order for the taking over of Niagara Company was heard in the New York Supreme Court in Buffalo, the United States attorney of the Western District of New York gave notice that the superintendent of insurance had acquired possession of the proceeds of some of the stolen bonds, and that the Warren Bank claimed the same. The order passed February 24th, and later on the same day a reinsurance agreement was executed between the superintendent and defendant Metropolitan Life Insurance Company. The Mechanics & Merchants' Bank had closed on February 13th, and so far as we know claims against it are worthless.

This suit, seeking to impress on the funds in the superintendent's hands a lien to the extent of the proceeds of the bonds, was begun March 12th, and the superintendent had then in his hands funds of Niagara Company amounting to more than that sum and has retained the same. When suit began, an injunction of the New York Supreme Court prevented all persons from suing the superintendent of insurance in respect of claims against Niagara Company. This injunction was modified by the same court to permit this suit. The superintendent unsuccessfully moved to vacate the order, and this action was affirmed by all the appellate courts of the state.

One more piece of testimony may be mentioned. When Marcino produced the bonds on February 7th, he did not give, nor was he requested to give, any explanation of their origin. The party proceeding to the brokers' office consisted of Marcino, an officer of the Niagara Company, the deputy superintendent of insurance, and a state examiner; but, before starting, the question was raised as to how they knew the bonds were not stolen, whereupon the deputy superintendent said: "They are negotiable bonds, and we have the right to rely upon what Mr. Marcino has said and sell them, and that is what we will do." Whereupon the party repaired to the brokers, and the deputy gave the orders for sale and arranged the method of payment. We do not discover that Marcino had said anything. We have noted that he was asked no questions.

The court below gave decree for plaintiff, declaring a lien of the amount demanded upon funds in possession of the superintendent, and enjoining him from paying over the same to the Metropolitan Company and the latter company from receiving, whereupon both defendants appealed.

Albert Ottinger, Atty. Gen., and Joseph C. H. Flynn, Deputy Atty. Gen. (John J. Cunneen, of New York City, and Clarence C. Fowler, Sp. Deputy Atty. Gen., of counsel), for appellant Beha.

Martin T. Nachtmann, of Albany, N. Y., for appellant Metropolitan Ins. Co.

Louis L. Babcock and Locke, Babcock, Hollister & Brown, all of Buffalo, N. Y. (Evan Hollister, of Buffalo, N. Y., of counsel), for appellee.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] What we consider the dominant and controlling facts of this litigation have been stated with fullness, because, after reflecting on the exhaustive arguments submitted, we are of opinion that the acts of the parties have rendered irrelevant most of the propositions of law discussed. The final facts proven by the evidence may be thus summarized:

On February 7th Niagara Insurance Company could not lawfully make a contract. The normal exercise of its business and corporate functions had been stopped by the injunction procured and served by the insurance department, which injunction was contained in an order to show cause that was the first step in the winding-up procedure on which the department had embarked. The sale of bonds on February 7th was not the act of, nor an act produced by, Niagara Company; that sale was by the direction

of, and was quite literally personally conducted by, the deputy superintendent of insurance, with and by the special authority of the head of the department.

The departmental motive was the feeling most justifiably produced by investigating the affairs of the Mechanics' & Merchants' Bank of Philadelphia. To that bank the officers of the insurance department had traced a very large part of Niagara Company's cash, and from that bank they had traced most of that money into unsecured loans to persons related to Marcino or unknown as solvent borrowers. The deputy superintendent regarded the Philadelphia deposits as probably worthless, and certainly of no value for purposes of reinsurance, on which step the department was determined, unless Marcino and his associates made up the whole of the impairment of capital which the state's examiners had ascertained and declared; a deficiency amounting to a sum not far from the amount transferred by Marcino's influence to the Philadelphia bank.

The object of the superintendent of insurance seems to us praiseworthy in every way. It was to safeguard the interests of the policy holders in the Niagara Company. If Marcino et al. saw fit or were able within a short time to make good the entire impairment, they might escape until the next time; but if, as a condition, or in the hope of adjourning hearing on the show cause order, about $40,000 could be squeezed out of them, the departmental officers in Buffalo thought (as the deputy superintendent said) that the Niagara Company could at least be reinsured, and the investments of the policy holders saved.

The manner in which the sale of February 7th was carried through is strongly corroborative of the power, motive, and purpose we find in the insurance department. The deputy superintendent was in full charge. He *knew* certainly nothing more than he had discovered in Philadelphia, but what he knew strengthened his suspicions and translated them into action. He would not take the bonds proffered by Marcino. He feared complications and said so. He insisted on Marcino selling them, and yet would not trust Marcino to turn over the cash received for the sale so positively ordered.

The insurance department never bought or received these bonds, much less did the Niagara Company receive or deal in any way with the bonds themselves. Niagara Company assuredly received the money, not because it asked or bargained therefor, but because the deputy superintendent compelled the transaction. Niagara Company was but a receptacle for money that the insurance department wanted to "sweeten" the reinsurance agreement already contemplated.

Marcino was promised nothing by Niagara Company for either bonds or money, and the only promise (if it was one) made by insurance department to Marcino was to delay hearing on the "show cause order" if he produced $40,000, and that delay occurred. Neither insurance department nor Niagara Company ever was a holder of the bonds; therefore neither could be a holder for value, nor a bona fide holder, nor one in due course, and all the phrases of the Negotiable Instruments Law (Consol. Laws, c. 38) are inapplicable. And when Niagara Company received the money, by order of insurance department, it paid (and certainly neither did the department) *no consideration.* That word signifies the price which is of value to the obligor or detriment to the obligee, a benefit to the promisor or a loss to the promisee; it is the material cause of contract. These most general definitions (and others) may be found in Corp. Jur. sub. nom. "Consideration."

[2] But consideration cannot exist without a contract; there must be a promise, an obligation; and here there was no contract with Marcino or any one else, no promise, and no obligation. Therefore the $39,130.08 which always was under the control of defendant superintendent of insurance, and which soon fell into his actual custody, was never anything more than the proceeds of stolen bonds, sold by the thief, Marcino, to some innocent holder through the New York Stock Exchange, which proceeds the insurance department took without contract or consideration, and by such taking procured no better title than Marcino had; i. e., no title.

Nor did the department give or cause any better title in another than Marcino had, for we find as a fact that the money stayed in the custody of the defendant superintendent; the Metropolitan Company had not received it when this suit began. Whether any actual transfer of the funds after the notice of February 23d would have changed rights, or impaired remedies, need not be considered, for there was no transfer. It follows that the facts show defendant superintendent of insurance as having the sum in suit in hand, but having no title thereto; the money belongs to plaintiff and the result below was right.

[3, 4] The superintendent of insurance has insisted that he could not be sued, not even to impress a lien on property in his official hands, because to sue him is to sue the sovereign state of New York. The objection is so far-reaching that his official immunity is said to prevent any and every court, whether of the state or the nation, from dealing with him as a defendant. · That this view of his official self was not shared by the courts of New York in the litigation arising over the permission to bring this suit (Matter of Bean, 238 N. Y. 552 and 618, 144 N. E. 888, 916) is perhaps immaterial; the courts of the United States must themselves decide on their own jurisdiction. But as matter of professional opinion it is interesting to note lack of agreement to the immunity claim here advanced.

It is plain that defendant superintendent does not assert and never has suggested that this money is owned by the state of New York, or that the state has any interest in the matter, except as it desires to fulfill a duty by winding up insolvent insurance companies. Compliance with the decree below will not involve the doing of "any affirmative act which affects the state's political or property rights." Hopkins v. Clemson College, 221 U. S. 636, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243. That a state or national official, appointed to perform acts and duties which, though appropriate for governments, do not involve any sovereign rights of that government, is not immune from suits virtute officii, is we think especially clear. In re Chetwood, 165 U. S. 443, 17 S. Ct. 385, 41 L. Ed. 782; Tindal v. Wesley, 167 U. S. 204, 17 S. Ct. 770, 42 L. Ed. 137; Matter of Carnegie Trust Co., 161 App. Div. 280, 146 N. Y. S. 809. Of course, a state may prefer to assume a position of ownership of assets of insolvent or embarrassed corporations (Lankford v. Platte Iron Works, 235 U. S. 461, 35 S. Ct. 173, 59 L. Ed. 316), but New York has not assumed that position.

We note Allen v. United States (C. C. A.) 285 F. 678, as a very relevant case, and that the court there went "no further" than to declare "that certain deposits" were held "in trust," leaving it to the state courts which had jurisdiction of settling the accounts of the Massachusetts commissioner of banks to decree payment. The reason for this action was (page 684) that there might be others similarly situated and the assets insufficient to pay all in full. No such difficulty exists here; defendant superintend-

ent has a particular fund to which, and to all of it, plaintiff has established his right.

Decree affirmed.