Irving M. GRUBER and Leonora S.
Gruber, Plaintiffs,

v.

The CHESAPEAKE & OHIO RAILWAY
CO. et al., Defendants.

Civ. A. No. 30870.

United States District Court
N. D. Ohio, E. D.

Dec. 18, 1957.

Motion to Dismiss Appeal Granted
Feb. 12, 1958.

596

Jules Eshner (of Davies, Eshner, Johnson & Miller), Cleveland, Ohio, for plaintiffs.

Donald W. Hornbeck, J. H. Ritter and Richard Ogline (of Hornbeck, Ritter & Victory), Cleveland, Ohio, for Chesapeake & O. Ry. Co.

Robert J. Buckley and James A. Butler (of Bulkley, Butler & Rini), Cleveland, Ohio, for Robert J. Bowman, Robert J. Bulkley, Cyrus S. Eaton, Herbert Fitzpatrick and Walter J. Tuohy.

Carl M. Jacobs and Francis L. Dale (of Frost & Jacobs), Cincinnati, Ohio, for C. R. Hook, Jr.

CONNELL, District Judge.

Plaintiffs are joint shareholders of record of the Chesapeake and Ohio Railway Company, having purchased 5 shares of its common stock on April 3, 1947 and 10 shares of its common stock on October 10, 1948.

This is a shareholder's derivative suit brought on behalf of the Chesapeake and Ohio Railway Company, hereinafter called the C & O, against the directors and an officer of the corporation who are alleged to have committed waste of the corporate assets in the following transactions set forth in four separate causes of action:

1. A stock option plan adopted by the directors of the C & O on January 9, 1951, and ratified by a majority of the shareholders in April 1951.

2. A transaction with Mr. C. R. Hook, Jr., an officer of the C & O, relating to compensation received by him for a release of his option rights under such stock option plan.

3. Another transaction with Mr. C. R. Hook, Jr. with reference to the applicability of Section 16b, Securities and Exchange Act of 1934.

4. An amendment to an employment contract between the C & O and Mr. Walter J. Tuohy, a member of the board of directors.

The matter is presently before the court on cross-motion for summary judgment by the plaintiffs or in the alternative, to strike certain of defendant's defenses, and also on motion for summary judgment by the defendants.

As to plaintiff's first cause of action, there are no disputed issues of fact and primarily, the question to be decided is whether the C & O stock option incentive plan is invalid for lack of consideration running to the corporation.

On January 9, 1951, the board of directors of the C & O had a director's meeting to discuss the activity of prior years and the corporation's future. This meeting was attended by 14 out of the full membership of 15 members. Of the 14 members present, three were officers of the company; Mr. R. R. Young, Chairman, Mr. W. J. Tuohy, President and Mr. R. W. Purcell, Vice-President-Law.

At this meeting the past earnings, rate of return to shareholders, the market price of the company's shares on the stock market and other business incidental to operating the corporation was discussed.

A review of the average market price of the common stock, dividends and earnings of the C & O indicates there was cause for apprehension about the com-

pany's future, because in 1946, the average market price of shares was 58⅛; in 1947, 48⅛; in 1948, 38³⁄₁₆; in 1949, 30⅝; and 30⅛ in 1950.

The dividend to shareholders in 1946 was $3.50; in 1947, $3 plus ¼₀ Nickel Plate; in 1948, $3; in 1949, $3; and $1.50 in 1950.

The average market price of the shares had dropped from 58⅛ in 1946 to a low of 30⅛ in 1950; the dividends to shareholders had dropped from $3.50 in 1946 to $1.50 in 1950; the earnings dropped from $3.62 per share in 1946 to $1.36 per share in 1949, but recovered to $4.25 per share in 1950.

Apparently the directors of the C & O decided to revitalize the corporation; it was their purpose to give more incentive and future certainty to their executives; they had to assure themselves the retention of their productive men in the expectation that more production in the form of earnings would consequently ensue. They therefore adopted by resolution a stock option incentive plan.

Like most such plans its basic purposes were twofold; to induce its competent executives to remain with the company; and to provide them with an incentive for more efficient management resulting in higher earnings.

This is a day and age in which, despite all the efforts of our educational system, there is a shortage of competent executives. Leadership cannot be gleaned from books. Some men are endowed with leadership though their formal education may appear to be inadequate. Other men reach such positions by hard work, experience, and natural aptitudes. Education per se does not bestow the quality of leadership on executives. Great corporations now go into competition with each other to secure the services of coming executives. The largest corporations vie with each other to entice away promising young leaders of smaller industries, to join theirs. Many young executives are overcome by the temptation to go with larger companies, at larger salaries with the increased variety of benefits offered.

It becomes a problem in industry to hold its own leadership: to keep its coming executives from seizing the tempting offers held out to them by its own competition.

The process of holding onto top and coming executives and leadership has become such a matter of self-defense that most unique plans have been invented to prevent such losses. Many such plans have become the subject of litigation. Most go into automatic operation without any objection. Competition has become keenest in a contest for men.

The C & O adopted its plan in the year 1951 which came under attack by the plaintiffs in 1954.

It adopted its plan because some type of similar plan is the modern and quite universal business practice of the country today; it has become a business custom that corporation executives are given a proprietary interest in the company for which they work, through the granting of common stock at its present market price. The executive's "benefit" materializes when the stock which he has received rises in price on the market through increased efficiency in management and operation of the company. The company is compensated by increased profits, ultimately distributed to the shareholders through dividends, and elicited to a great extent by that continuity of service on the part of its executives which would otherwise be frustrated.

An incidental benefit received by such executives is the capital gain treatment of the profits from the sale of such securities under Section 130A of the Internal Revenue Code, as added in 1950, 26 U.S.C.A. § 130A provided that the plan complies with certain prerequisites.

Competition in industry today is not at all limited to marketing the finished product but most essentially includes an unceasing effort to acquire men of outstanding ability to direct and manage the industry itself. Of greater significance however is the anxiety of industry to hold such men once they are acquired. Many companies have calmed their anx-

iety by granting key employees partial ownership through a stock option plan.

■ The acquisition or retention of key personnel and the signing of an employment contract are the two most common forms of benefits received by a corporation sufficient to constitute consideration for the issuance of stock under such a plan. Within the plan itself, there must be included conditions or circumstances which are calculated to insure that the corporation will receive the contemplated consideration. See Rosenthal v. Burry Biscuit Corp., 30 Del.Ch. 299, 60 A.2d 106; Sandler v. Schenley Industries, Inc., 32 Del.Ch. 46, 79 A.2d 606.

The purposes of the stock option incentive plan of the C & O herein as set forth in Exhibit 1 are: "to secure to The Chesapeake and Ohio Railway Company * * * the advantages of the incentive inherent in stock ownership on the part of key officers responsible for the continued success of the company and to create in such key officers a proprietary interest in, and a greater concern for the welfare of the Company".

The options were granted "For the services and duties *to be rendered and performed by the officers* * * * at the purchase price herein specified and subject to all of the terms and conditions set forth herein".

■ The phrase "to be rendered and performed" is in the future tense and it connotes the idea of officers being later rewarded for what they meanwhile do.

The conditions set forth within the plan begin with par. 4 which provides that the options must be exercised before 5:00 p. m. December 31, 1957; that an optionee may on or after May 1, 1951 exercise his option as to not more than 20% of the shares made available to him, and subject to provisions of par. 5 hereof, an optionee may exercise his option as to the remaining shares made available to him as follows: 20% on or after the option date in 1952; 20% on or after the option date in 1953; 20% on or after the option date in 1954; and the remaining 20% on or after the option date in 1955.

Paragraph 5(a) provides "If in any of the calendar years 1951, 1952, 1953, or 1954, the net income of the Company, computed in accordance with the formula hereafter in this paragraph 5 set forth, shall fall below an amount equal to $3.50 per share of the Company's common stock outstanding at the end of each such year, respectively, this option shall be revoked as to the number of additional shares otherwise becoming available for purchase by each participant in the succeeding year in accordance with the schedule set forth in par. 4 hereof."

Thus the criterion of business success became a condition precedent to exercising part of the option and the condition precedent was that the company must earn at least $3.50 per year, or approximately 10% of the cost of the stock. Thus, if the company and its plan did not accomplish what it envisaged, neither would the executives!

Considering how economic conditions not within their control could reduce the value of this stock, it is apparent that these executives entered into a bargain which was in no wise one-sided. They might have put forth the most prodigious of efforts and nevertheless have lost. But the plan contemplated a means of requiring them to put forth maximum effort, and the chances of gain were no greater, to say the least, than the probability of loss.

The purchase price of the shares by the optionees as set forth in paragraph 6, "shall be $36.125 per share, which has been determined to be the present fair market value thereof based on the closing price of the common stock of the Company on January 9, 1951, the date on which the Board of Directors of the Company approved the sale of the shares provided herein; * * * *"

Paragraph 8 provides that the options are not transferable otherwise than by will or the laws of descent and distribution and can only be exercised by the optionee during his lifetime. In the event that the optionee should leave the employ-

of the company (through retirement or otherwise) or die, during the years 1951, 1952, 1953, or 1954, he (or in case of death his personal representatives) may, subject to the provisions set forth in the plan, exercise his option as follows: "For each full month of employment by the Company in the year of leaving the Company's employ or death, he shall be entitled to exercise the options with respect to 1/12 of the entire number of shares to become available to him during the following calendar year." The optionee or his personal representative in case of his death, can exercise such option to the extent to which he was entitled by reason of his employment within three months after leaving the company's employ or death.

Consideration for the options is inherent in the plan itself because the optionee is unable to exercise his option unless he first renders service to the company. The extent to which an officer can exercise his option rights under this plan is dependant upon his continued employment.

The rights granted a participant in January 1951, though becoming exercisable in part month by month and year by year as his employment continued, did not become exercisable in toto until 4 years later on the option date in 1955.

To insure further that the C & O would receive a "benefit" the plan imposes a requirement not included in plans of other corporations that have been involved in litigation through shareholder suits. As a condition precedent to the right to exercise options maturing in each of the years from 1952 through 1955, the C & O's net income must be at least equal to $3.50 per share of common stock for each preceding year.

Plaintiffs' contention that the optionee could immediately exercise his option rights upon adoption of the plan is untenable. The plan provides that any participant may "on or after May 1, 1951" exercise his option as to not more than 20% of the shares available to him. Correspondingly the option may be exercised to the extent of 20% of the remaining available shares on or after the option date in 1952, 1953, 1954, and 1955 subject to the aforementioned condition precedent. A participant who elected to leave the employ of the C & O was permitted to exercise his option, "to the extent that it can *then* be exercised", within three months after the termination of such employment. Together with any full yearly option rights accrued at the date of termination of employment, the participant who terminated his employment was entitled to exercise his option as to 1/12 of the shares available to him in the succeeding calendar year for "each full month of employment" in the year in which he terminates his employment or dies.

The rendition of services after the date of adoption of the C & O plan was essential to participation. The options were granted on January 9, 1951, *subject to defeasance* by shareholder disapproval at their annual meeting, and the participants were not entitled to exercise their rights with respect to the initial maturity of 20% of their total allocation until on or after May 1, 1951, and if the participants had not remained in the employ of the C & O at least until then, they would not have been entitled to exercise such rights.

Plaintiffs contend that the option plan did not become effective until the date of the shareholder's ratification on April 17, 1951 and cite the Internal Revenue Act of 1950 in support of their position. However, we are not so concerned directly with the Internal Revenue Act in this particular cause of action, but rather that of "Contract Law" with reference to Consideration.

The C & O plan expressly provides that it was "subject to defeasance" by shareholder disapproval.

The word "defeasance" is derived from the past participle of the french verb desfaire which means to undo. It is defined: 1. A rendering null or void. 2. A condition the fulfillment of which avoids an instrument. (Webster's Collegiate Dictionary 5th Edition) In other words shareholder ratification was a con-

dition subsequent rather than a condition precedent to the existence of the plan. The effective date of the C & O plan was January 9, 1951.

Plaintiffs place emphasis on the fact that a participant, had he severed his employment on May 1, 1951, could have exercised his option to 26⅔% of his total allocations.

It is not here claimed in the year of our Lord 1957, that with the exception of one executive who left C & O's employ to become Assistant Postmaster (wherein ownership in any railroad stock might prove undesirable since railroads carry mail) no other executive since 1951 failed to remain in the employ of the C & O for the full length of time required and Hook didn't leave just to profit on stock; he left to do a job for the country, and largely at his own expense. As to all the others, if we may use a colloquial expression, they still follow the example of the "mule who never lost sight of the carrot!"

Plaintiffs contend that " * * * consideration for this part of the option is, to say the least, weak". Suffice it to say in passing that the participants could not exercise their options in toto until 1955, four years later. Yet in Holthusen v. Edward G. Budd Mfg. Co., D.C., 53 F.Supp. 488 cited by plaintiffs in support of their position, the court held a stock option plan valid even though a participant could exercise his option in toto one year after its adoption because of the existence of an employment contract for one year. How much more reasonable is the C & O plan herein where the participants are unable to exercise their options at all unless they *work* at least 4 months for 26⅔% and then must work for 4 years to exercise fully their options to the remaining 73⅓%. Plaintiffs in their brief cite certain cases in support of their contention that the C & O stock option is invalid for want of consideration, to which attention is directed.

They cite Rosenthal v. Burry Biscuit Corp., 30 Del.Ch. 299, 60 A.2d 106, wherein the court held a stock option plan invalid. In that case Mr. Burry was at all times President of the corporation and a member of the board of directors which he completely dominated. A resolution was therein passed giving Burry an option to purchase 50,000 shares at $6 per share when the market value was approximately $9. The purchases were to be made *within* five years and could have been purchased *all at one* time had Burry so desired. Chancellor Seitz in deciding the case said that no explanation could be found for giving Burry a larger interest in the company; that there was nothing that resembled consideration, nor were there facts that indicated that the directors exercised a proper business judgment.

The case at bar is at great variance with the Burry case. In the within case the members of the board of directors who were to be participants abstained from voting on the plan; here there are no documents before us such as were submitted in the Burry case to indicate that the remaining directors were dominated completely by those not voting. Burry could have profited to the extent of 50,000 shares x $3 or $150,000 in 5 minutes. Such case bears no resemblance to this. Herein the men must work 4 years to acquire the same right, which Burry acquired immediately from himself.

Plaintiff also cite Kerbs v. California Eastern Airways Inc., 33 Del.Ch. 69, 90 A.2d 652, 34 A.L.R.2d 839 where the court "struck down a stock option plan under which the options could be exercised immediately upon their issuance" (page 38 plaintiff's memorandum) from which we shall quote at length. The cause therein involved both a stock option plan and a profit sharing plan. Our discussion will be limited to the stock option plan.

Plaintiffs, shareholders therein, brought action in behalf of the corporation to enjoin the corporation from putting into effect a stock option plan, adopted by a board of directors consisting of 8 members of whom 5 were beneficiaries, and ratified by a majority of the shareholders. The court on page 655 of 90 A.2d stating the facts said,

"Each option to be granted is exercisable at any time within a period of 5 years from the date of issuance but not later than 6 months after termination of the employment of executive to whom it is issued. Each is exercisable for either the full number of shares subject to the option or for any part thereof  *  * "

The court concluded in substance, that because the options could be exercised in toto immediately upon their issuance and could be exercised within a six-months period after termination of employment, "the plan and options issued thereunder do not of themselves insure that the benefit of retaining the services of the employee to whom the option is granted will inure to the corporation, nor is there any showing of surrounding circumstances which would insure the same result."

In reaching this conclusion, the court would not prescribe a minimum set of requirements for a valid stock option plan, as that would probably unduly limit legitimate corporate action but it did set forth (on page 656) an enlightening discussion worthy of quotation here.

" *  *  * In view of the different circumstances of each corporation and of the permissible variations in the objects sought to be accomplished by stock option plans, the validity of each plan, of necessity, can be ascertained only after a full consideration, not only of the terms of the plan itself, but of the surrounding facts and circumstances as well. No rule of thumb can be devised to test the sufficiency of the conditions which are urged as insurance that the corporation will receive the contemplated benefit. The most that can be said is that in each case there must be some element which, within reason, can be expected to lead to the desired end. What that element may be can well differ in each case."

The court then reviews several cases and tells the reason why such courts either upheld or invalidated similar plans as follows:

"In Holthusen v. Edward G. Budd Mfg. Co., D.C., 52 F.Supp. 125, an option plan was enjoined because the employee was not obligated to remain in the company's employ, nor was the right to exercise the option made dependent upon continued employment. Subsequently, an amended plan requiring the optionee to remain in the company's employ for one year and preventing exercise of the option until one year after essuance was upheld. See Holthusen v. Edward G. Budd Mfg. Co., D.C., 53 F.Supp. 488, 490. In Wyles v. Campbell, supra [D.C., 77 F.Supp. 343], an option was upheld upon a finding that the optionee was under an employment contract. In Wise v. Universal Corp., D.C., 93 F.Supp. 393, an express finding was made that but for the grant of the options the employees would have terminated their services and the option was upheld. In Sandler v. Schenley Industries, Inc., supra, a contract to purchase the shares in installments over a period of years was upheld in view of the circumstances that the employee would have ended his employment except for the contract. In McQuillen v. National Cash Register Co., supra [D.C., 27 F.Supp. 639], an option was upheld which provided for its exercise in installments over a period of years, and which provided that it became null and void upon the ending of the optionee's employment. In Rosenthal v. Burry Biscuit Corp., supra, an option was invalidated because there was, inter alia, no showing that it was granted either to induce the optionee to enter the company's employ or to remain in it. In Clamitz v. Thatcher Mfg. Co., 2 Cir., 158 F.2d 687, options were sustained which could be exercised only as long as the optionee remained in the company's employ."

The court then briefly states in summation of the previous discussion,

"In each of these cases there was some element, either in the plan it-

self or in the surrounding circumstances reasonably calculated to keep the optionee in the corporation's employ. We do not think that it is indispensable to bind the optionee by an employment contract but there must be some circumstance which may reasonably be regarded as sufficient to insure that the corporation will receive that which it desires to obtain by granting the options."

In no case which we have found were men required to work as long as the 4 year period required herein.

This case at bar is readily distinguished from the Kerbs case in that the participants herein are unable to exercise their options in toto immediately after issuance. This privilege is given to them only after four years of employment. From the terms and conditions of the C & O plan, it is perfectly clear that the extent to which an optionee is permitted to participate is completely dependent upon his continued employment.

Courts have upheld a plan where consideration was found in the condition that one year's service by the participant was to be performed prior to the exercise of the option. Holthusen v. Edward G. Budd Mfg. Co., D.C., 53 F.Supp. 488.

We can find no distinction between a plan where a participant must work for one full year before he can exercise an option in toto, and the C & O plan where the participant must work 4 months to exercise his options to 26⅔% and then must work approximately 3 years and 8 months more before he can exercise the remainder of his option. At the time this mere right to buy in 4 months at today's price was no great boon to the purchaser. Under normal conditions he merely obtained the right to buy at about the same price any other member of the public, including this plaintiff might then have had. His stock had the same chance to go up as down. But he and other executives acquired the temptation to make it go up for all stockholders, including plaintiff, if it were humanly possible to do so by any prodigious efforts he was thus enticed to put forth.

If anything, the C & O plan is conditioned, by its terms, to furnish greater assurance " * * * that an employee won't take his options and leave prior to rendering services reasonably expected by the corporation in return for the grant." See Frankel v. Donovan, Del.Ch. 1956, 120 A.2d 311. A participant herein gets ¼ of his option for working ⅓ of a year (which as we have just stated was not exactly a gift) but then must work 4 more years to get the remaining ¾, whereas in the Budd case, supra, he need only work one year to get the whole option.

Defendants have set forth in their answer various defenses to the complaint: (1) Failure of plaintiffs to exhaust intra-corporate remedies, (2) Conclusiveness of the Interstate Commerce Commission finding with reference to the stock option plan and (3) Laches. In view of our finding the stock option plan to be valid in law, it is unnecessary to rule upon these 3 defenses.

For the aforementioned reasons we find, as a matter of law, that the C & O stock option incentive plan was supported by sufficient and adequate consideration.

We find that the execution of the C & O stock option incentive plan does not constitute a waste nor a gift of corporate assets.

We find further that the C & O stock option incentive plan is valid in law.

### 2nd Cause of Action.

Defendant Hook, a vice-president of the C & O, resigned his employment with the company on January 7, 1953. He had been a designated participant for 5,000 shares in the C & O stock option incentive plan from the beginning and rights to an option to purchase 3,000 shares at the option price of $36.125 had accrued to him at that time. Hook had three months from the date of his resignation to exercise this option. The market price for shares on January 7, 1953 was $39.125. Thus the market had advanced since the plan began. Had it been other-

wise Hook might just as well have sustained an equivalent loss.

For an immediate release of his option rights under the plan, the company's principal officers recommended, and the board of directors unanimously approved a payment of $20,000 to defendant Hook.

The plaintiffs allege that, "Inasmuch as the difference between the market price and the option price was $3.00 per share, by simple arithmetic it is apparent that the maximum value that could conceivably be placed upon the release of the option rights was 3,000 x $3.00 or $9,000.00 Accordingly, the C & O simply made a gift to defendant Hook of $11,-000.00"

Plaintiffs move for partial summary judgment to the extent that $11,000 of the $20,000 payment was a gift to defendant Hook.

Defendants move for summary judgment contending that the $20,000 payment was justified because of the value of immediately securing additional shares to reallocate under the C & O stock option plan to other key officers remaining in the company; and the gain of $9,000 in the option price of the 3,000 shares to which an option had already accrued to defendant Hook; plus a probable gain of $6,000 in the option price of 2,000 additional shares made available for reallocation by Hook's resignation.

■ There has been no claim by the plaintiffs with respect to this cause of action that the board of directors acted beyond the scope of their authority in contracting with defendant Hook as such. The action by the directors involves an exercise of discretionary power concerning the corporation's internal affairs.

The question to be decided here is whether or not the board of directors in this transaction so abused their discretion that in law their action amounted to fraud or breach of trust.

■ In the absence of usurpation, fraud, or gross negligence, courts of equity will not interfere at the suit of a dissatisfied minority of shareholders, merely to overrule and control discretion of the directors on questions of corporate management, policy or business. Siegman v. Electric Vehicle Co., C.C., 140 F. 117; 14a C.J. p. 84, notes 77, 78, 19 C.J.S. Corporations § 743.

"Courts interfere seldom to control such discretion intra vires the corporation, except where the directors are guilty of misconduct equivalent to breach of trust, or where they stand in a dual relationship which prevents an unprejudiced exercise of judgment; and, as a rule, only after application to the stockholders, unless it appears that there was no opportunity for such application * * *" (United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, at page 263, 37 S.Ct. 509, 510, 61 L.Ed. 1119).

■ From the entire record it is apparent that the board of directors of the C & O, in paying defendant Hook $20,-000 for an immediate release of his option rights were not guilty of fraud or of misconduct amounting to a breach of trust.

Defendant Hook was to resign from the company. He had the right to purchase 3,000 shares of stock which had accrued to him by virtue of the stock option plan, within three months after his resignation. Original provisions of the plan set aside a particular 112,500 shares to be used exclusively for incentive purposes. There were no more to distribute to key employees unless an option lapsed or a participant released his option rights. Hook had the right to wait for three months before exercising his option and take whatever advantage he could of a possible rise in the market. The board of directors wanted the shares immediately because these were not just shares to be traded on the market for a price, they were shares to be used to induce other men to remain in the company's employ; to give them an incentive for greater productivity and more profits. Defendant Hook could have purchased these shares and removed them from the control of the directors which would have prevented their use within the company aforesaid.

In consideration for the immediate release of his stock option rights, the board of directors, acting within their authority, decided to offer Hook $20,000, Hook accepted and thereafter these shares were immediately redistributed among 20 key employees, all in accordance with the original plan.

This transaction was not gratuitous; rather it was a bargain and exchange on the part of businessmen—each of whom gave up something which he believed to be of value to him and each of which received in exchange something he believed to be of value to him.

We are unable to find any fraud or misconduct amounting to a breach of trust by the directors in this transaction as a matter of law. We cannot find that the price of the intangibles for which they paid was excessive, as a matter of law.

█ This court will not substitute its judgment for that of the board of directors where they have acted in good faith within their corporate powers as they have in the present case.

We find that the payment of $20,000 to defendant Hook in consideration for the immediate release of his stock option rights with all the additional connotations it carried for the company was a matter of business judgment exercised properly by unanimous vote by the board of directors and pursuant to a question of corporate management, and within their proper control.

### 3rd Cause of Action.

This is a statutory action under Section 16(b) of the Securities Exchange Act of 1934 (hereinafter called the "Act"), 15 U.S.C.A. § 78p(b).

Under the C & O stock option plan referred to in plaintiffs' first cause of action, an option was granted to defendant Hook for the purchase of 5,000 shares of common stock of the company at the price of $36.125 per share.

On January 7, 1953, Mr. Hook, then vice-president of personnel, resigned from the company. At that time he was entitled to exercise within three months, his options to 3,000 shares by virtue of the stock option plan. (On the option date in 1953, defendant Hook became entitled to exercise his option to an additional 1,000 shares—options to 2,000 shares having previously accrued.)

The C & O paid defendant Hook $20,000 in consideration for a release by him of his rights under the plan.

Plaintiffs contend that the aforementioned transaction constituted a "purchase and sale" by defendant Hook of his option rights to 1,000 shares within a six months period at a profit to him and that this profit is recoverable on behalf of the company under Section 16(b) of the Act. Plaintiffs also contend that this transaction constituted a "purchase and sale" by defendant Hook of 3,000 shares of the C & O stock, the subject of his option, within six months, the profit from which it claims is recoverable on behalf of the company under Section 16(b) of the Act.

Defendant Hook contends that the transaction, should the court determine that such is a purchase and sale under provisions of the Act, is exempt from the operation of Section 16(b) by virtue of Rule X–16B–3, a 1952 amendment adopted by the Commission. The pertinent portions of Section 16(b) insofar as they are relevant to the issue herein are as follows:

"For the purpose of preventing the unfair use of information which may have been obtained by such * * * director, or officer (of a company having equity securities listed on a national securities exchange) by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer * * within any period of less than six months * * * shall inure to and be recoverable by the issuer * * *. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer

in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover * * * any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection". 15 U.S.C. A. § 78p(b).

Rule X–16B–3 as amended in September 1952, effective November 1, 1952, two months before the time of the Hook transaction is as follows:

"Exemption from Section 16(b) of Certain Acquisitions of Securities Under Stock Bonus or Similar Plans."

"Any acquisition of shares of stock or non-transferable options (other than convertible stock acquired pursuant to a transferable option, warrant or right) by a director or officer of the issuer of such stock shall be exempt from the operation of section 16(b) of the Act if the stock or option was acquired pursuant to a bonus, profit-sharing, retirement or similar plan meeting all of the following conditions."

"(a) The plan has been approved specifically, or through the approval of a charter amendment authorizing stock for issuance pursuant to the plan, by the security holders of the issuer at a meeting for which proxies were solicited in accordance with such rules and regulations, if any, as were then in effect under section 14(a) of the Act."

"(b) If the selection of the persons who may receive funds or securities pursuant to the plan, or the determination of the amount of funds or securities which may be so received by any such person is subject to the discretion of any person, such discretion shall be exercised by

(1) a committee of three or more persons having full and final authority in the matter, or (2) the board of directors of the issuer, provided the members of such committee, or a majority of the directors acting in the matter, are not entitled to participate in such plan or in any other similar plan provided by the issuer or any of its affiliates."

"(c) The plan effectively limits the aggregate amount of funds or securities which may be allocated with respect to each fiscal year pursuant to the plan, either by limiting the maximum amount which may be allocated to each participant in the plan or by limiting the maximum amount which may be so allocated to all such participants."

"(d) The acquisition of the securities pursuant to the plan does not involve the payment of any cash (other than the application of funds currently received pursuant to the plan or payable pursuant to the option contract) directly or indirectly to the issuer or any of its affiliates." (17 CFR Section 240.16b–3 1956 pocket supplement.)

Assuming without deciding that defendant Hook's waiver and release of his rights under the C & O stock option plan is a purchase and sale under the provisions of Section 16(b), as contended by the plaintiffs, we are constrained to decide therefore whether or not the transactions are exempt from the operation of Section 16(b) of the Securities Exchange Act of 1934, by virtue of Rule X–16B–3 as amended in September 1952.

This question has been squarely decided by Judge Dawson, United States District Judge for the Southern District of New York on July 16, 1956, in Greene v. Dietz, 143 F.Supp. 464.

The issue involved in that litigation resulted from the exercise, by the individual defendants therein, of certain stock options in 1953 and 1954 pursuant to a stock option plan that had been approved by the stockholders of the C.I.T. Financial Corporation on June 26, 1951.

The action was brought by shareholders in behalf of the corporation, under the Securities Exchange Act of 1934, Section 16(b) to recover profits which defendant participants of the plan had realized through a purchase and sale of such securities because each individual defendant sold shares of common stock of the C.I.T. at a price higher than the option price within six months before, or within six months after the date upon which he exercised his option.

Judge Dawson clearly defined the issues before the court and at page 468 under the subtitle "Discussion" in paragraph 1, puts forth the issue in question form as follows:

"Did Rule X–16B–3, as in effect at the time of the acquisition of shares by the defendants, exempt acquisitions pursuant to a Restricted Stock Option Plan from the provisions of § 16(b) of the Act?"

Following this interrogatory is an exhaustive explanation of the purpose and history leading to the 1952 amendment and consideration is given to argument of plaintiffs therein that the Rule applied only to a bonus, profit-sharing, retirement or similar plan which did not specifically include a restricted stock option plan—the same argument of plaintiffs herein.

Judge Dawson concluded "that Rule X–16B–3 has, during the time of the acquisition of shares by the defendants herein, applied to stock acquired upon the exercise of a restricted stock option which conformed to the requirements of the Rule." On page 473 under title "Findings" 4th paragraph the court stated:

"The Court finds that Rule X–16B–3, as promulgated by the Commission in September, 1952, was applicable to the acquisition of shares of stock under Restricted Stock Option Plans meeting the requirements of said Rule."

This decision was appealed to the U.S. Court of Appeals for the Second Circuit, 247 F.2d 689, 692, wherein the appellants urged the following three principal contentions that they had also alleged at trial:

"(1) that the C.I.T. Plan was not within the general type of stock bonus or similar plan encompassed by the exemptive provisions of SEC Rule X–16B–3;

"(2) that even if this plan be within the general type so encompassed it did not comply with all the conditions set forth in that Rule; and

"(3) that the promulgation of amended Rule X–16B–3 exceeds the power and authority of the SEC in that it conflicts with the purposes of section 16(b) of the Securities Exchange Act."

The Circuit Court of Appeals, at the outset, disposed of appellants' first and second contention unequivocally by stating:

"(1) Judge Dawson adequately considered and disposed of the first two contentions, and we refer to his opinion for a complete answer to these two arguments presented on appeal."

The Court thereafter confined its opinion to the appellants' third contention— whether the Commission exceeded its power and authority by its promulgation of the 1952 amendment. The Court did not find it necessary to adopt Judge Dawson's opinion with respect to appellants' third contention and expressed doubt as to the power of the Commission to promulgate the Rule but upheld the lower court's decision with respect to this contention for the individual defendants because they had relied in good faith on the Rule itself.

We can add nothing further; our issue has been resolved. The profit from a purchase and sale of stock by participants of a restricted stock option plan which meets the standard of the Rule, within six months of the exercise of an option, is exempt from provisions of Section 16(b) of the Securities Exchange Act of 1934 by virtue of Rule

X–16B–3 as promulgated by the SEC in September 1952 and is therefore not recoverable on behalf of the corporation.

The question that remains is whether or not the C & O stock option plan meets the standard of the Rule. There has been no contention put forth by the plaintiffs herein that it does not. From a comparison of the standard set forth herein with the conditions of the plan as set forth in the first cause of action supra, it is apparent that the C & O plan does meet the requirements of the Rule.

It is our finding that the transactions between defendant Hook and the C & O were exempt from provisions of Section 16(b) of the Securities Exchange Act of 1934.

We further find Section 16(b) of the Act gives no right of action to the corporate defendant for any profits realized by defendant Hook on the waiver and release of his option rights on the date set forth in the complaint because such transactions were exempt from the provisions of Section 16(b) of the Act.

The court finds that Rule X–16B–3 as promulgated by the Commission in September 1952, was applicable to the transactions of defendant Hook herein.

The court finds that the C & O stock option incentive plan meets the standard of Rule X–16B–3 as promulgated in September 1952.

### 4th Cause of Action.

On July 20, 1948, Walter J. Tuohy and the C & O entered into two separate agreements—an employment contract and a stock purchase agreement.

### The Employment Contract.

The employment contract, among other things in substance provided that Tuohy was to be employed by the C & O as an executive until December 31, 1953 in consideration for which Tuohy was to receive compensation to be determined from time to time by the board of directors, but in any event, he was not to receive an amount less than $55,000 per year.

The C & O could terminate Tuohy's employment should he become physically or mentally incapacitated to serve as an executive or if he indulged in personal misconduct outside his employment. Tuohy reserved the right to terminate his employment should he be elected or appointed to a position in the company lower in rank than that previously held by him; or for failure to be appointed to any position; or if his salary at any time was reduced in amount, with certain exceptions.

In the event Tuohy terminates his employment or refused to perform his duties or if he should have become physically or mentally incapacitated to serve as an executive and such incapacity continued for six months, the company then had the right to purchase a certain number of shares of common stock of the company acquired by Tuohy under the stock purchase agreement. The number of shares the company could purchase varied with the length of Tuohy's employment and the purchase price of such shares was also provided for.

Tuohy had the right at his option to terminate the employment contract should the shareholders fail to approve the stock purchase agreement between the parties.

### The Stock Purchase Agreement.

On July 20, 1948, by agreement the C & O sold to Walter J. Tuohy 10,000 shares of its common stock at $37.375 per share. The purchase agreement provided that Tuohy would give his installment note in the amount of $373,750 as the purchase price. Payment of the note was to be made in ten installments within as many years—the first nine installments in the sum of $5,606.25 and the last installment in the sum of $323,293.75. The shares purchased were pledged as security on the note.

Tuohy had the right to receive all dividends, to exercise voting rights and to withdraw from the pledged security, all shares for which he had annually paid in full.

The board of directors of the C & O reserved the right to submit the stock purchase agreement to the shareholders for their approval at the annual meeting in 1949 and had the shareholders declined approval, the agreement would have been without effect.

The agreement was not assignable by Tuohy during his lifetime but was binding upon him and his executors.

On February 18, 1953, Tuohy and the C & O agreed to amend the original employment contract which was to be effective retroactively to January 1, 1953.

An analysis of the amended employment contract shows that it differs from the original contract in the following respects:

(a) Walter J. Tuohy promised to extend his employment obligation with the C & O at least until December 31, 1954 and thereafter indefinitely until either party thereto gives the other 12 months notice of intention to terminate the contract.

(b) In the event Tuohy died or became physically or mentally incapacitated to serve as as executive and such incapacity continued for 6 months, while employed under the contract, he or his legal representative, within six months thereafter, had the right to require the C & O to purchase and the C & O agreed to purchase, the shares then pledged with the C & O under the stock purchase agreement as security for the promissory note, at the original purchase price of $37.375 per share.

(c) If, on January 20, 1958, Tuohy should still be in the employ of the C & O under the contract, and if he should present a written request for an extension of his promissory note, and if no default exists in the payment of any installment of principal or interest at the time of the request, the C & O will grant, on or before July 20, 1958 an extension of the maturity date of the note from July 20, 1958 to July 20, 1963 or to the termination of Tuohy's employment whichever was earlier.

(d) The C & O promised not to transfer, assign, or negotiate the promissory note so long as no default existed and Tuohy remained in its employ under the contract.

Plaintiffs contend that the amended employment agreement, effective January 1, 1953, is illegal, void and injurious to the interests of the common shareholders in the following respects:

"23 a. The effect of the option in Mr. Tuohy and his estate to resell the stock to the Company is to convert the stock sale of 1948 to Mr. Tuohy into a transaction whereby he receives all the benefits of the ownership of the stock, including dividends, without assuming the risk inherent in the ownership of the stock, namely, the risk of loss to the equity holders in the Company. This privilege was accorded Mr. Tuohy without consideration on his part by way of services or otherwise.

"b. The effect of its terms is to unreasonably tie up, for the sole benefit of Mr. Tuohy, substantial assets of the Company which otherwise would be available for working capital by prohibiting the Company from negotiating, hypothecating, or otherwise using the note of Mr. Tuohy and by prohibiting the Company, by virtue of the Purchase Agreement of September 1, 1948 (Sic), from pledging or otherwise dealing in the stock pledged to it by Mr. Tuohy.

"c. Said agreement obliterates the stated purpose of the sale of 1948, which was to give Mr. Tuohy ownership of an interest in the Company.

"d. Said amended agreement was not submitted for approval to the shareholders, although the original Stock Purchase Agreement had previously been approved by them.

"e. The notice to the shareholders in the proxy statement of April 30, 1953 did not adequately disclose the full effects of said agreement."

Defendants have moved for summary judgment. Plaintiffs have cross-moved for summary judgment or, in the alternative, for an order striking various defenses.

Contentions of the plaintiffs will be discussed in the order set forth in the complaint.

■ The amendment to the Tuohy employment contract is supported by sufficient consideration and is therefore valid and legally enforceable. Consideration is a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. Cuneo Press v. Claybourn Corporation, 7 Cir., 90 F.2d 233; Porter v. Beha, 2 Cir., 12 F.2d 513, 516; Kilborn v. Pyne, 3 Cir., 279 F. 864, 866. "Benefit" as employed above means that the promisor, in return for his promise, has acquired a legal right to which he had not been previously entitled, and "detriment" means that the promisee, in return for his promise forbears from exercising some legal right he is previously entitled to exercise. Black's Law Dictionary, 4th Edition; Williston Section 102A.

■ Tuohy, by extending the duration of his employment contract for at least an additional year, until December 31, 1954, and indefinitely thereafter, until either party gave 12 months' notice to the other of its termination, suffered a legal detriment. He gave up his legal right to work for some one else during that extended period, which the C & O considered of great benefit to itself.

■ If the performances or promises on one side fulfill the legal requirements of consideration, they will support any number of counter-promises on the other side. Franklin Tel. Co. v. Harrison, 145 U.S. 459, 12 S.Ct. 900, 36 L.Ed. 776; Brightwater Paper Co. v. Monadnock Paper Mills, 1 Cir., 161 F.2d 869.

In exchange for Tuohy's forbearance in the exercise of a legal right, the C & O gave Tuohy; (1) the right to put to the company, at the original purchase price, stock held as security by the company for payment of a promissory note but only in the event of death or physical or mental incapacity; (2) the right to extend the date of payment of his promissory note (should he remain employed under the contract on January 20, 1958), for five years or until the termination of his employment; (3) a promise not to assign or negotiate the promissory note as long as he remained in the company's employ.

■ Plaintiffs have characterized the amendment to the Tuohy employment contract as an amendment to the stock purchase agreement of 1948 (p. 90 plaintiff's brief). They contend therefore that "Tuohy was enabled to hold the stock until his disability or death, and receive dividends (which have been substantially in excess of the 4% interest due on the note) without any risk."

Looking through the form to the substance of this transaction, it is readily apparent that it is not an amendment to the stock purchase agreement. The stock purchase agreement is an executed contract which is not a contract at all, except reminiscently. Nothing remains to be done by either party. It was completed at the instant the arrangement was made. Though the subsequent employment contract amendment has an effect on the "end product" of the stock purchase agreement, namely (the stock pledged), it cannot affect the stock purchase agreement as such.

To determine whether Tuohy is permitted to hold stock without any risk to him one need only inquire, what would happen in the event that Tuohy does not die nor become physically or mentally incapacitated and the market price of the shares should decline? Would he not lose? Is this not a risk? Is this not the identical risk assumed by all these executives from the very beginning? No one received any stock without paying for it. What fairer price than that then obtaining? Here, the C & O granted Tuohy a right based upon conditions over which he has no control. It is not an unlimited right but rather a right exercisable upon his death by his representative or by himself when he becomes so physi-

cally or mentally incapacitated that he can no longer be of use to the company.

Plaintiffs allege that the amendment to the employment contract is invalid because it "unreasonably restricts the use, for the sole benefit of Tuohy, of a substantial asset of the C & O" in that the C & O was prohibited from negotiating his promissory note which resulted in less available working capital and further, that the C & O was prohibited from pledging or otherwise dealing with the stock pledged to the company by virtue of the stock purchase agreement. Plaintiffs further allege that the agreement obliterates the stated purpose of the stock sale of 1948 which was to give Tuohy ownership of an interest in the company.

■ The hiring of an employee by a corporation for the purpose of carrying on the business authorized by its charter is within its implied power and not ultra vires. Harker v. Ralston Purina Co., 7 Cir., 45 F.2d 929, certiorari denied 284 U.S. 619, 52 S.Ct. 7, 76 L.Ed. 528; Rothschild & Co. v. Robin Line S.S. Co., 9 Cir., 26 F.2d 343.

■ The power of a corporation to employ also carries with it the incidental power to enter into an agreement with an employee in the matter of his compensation. Rogers v. Guaranty Trust Co. of New York, 2 Cir., 60 F.2d 114, certiorari granted 287 U.S. 586, 53 S.Ct. 80, 77 L.Ed. 512, reversed on other grounds 288 U.S. 123, 53 S.Ct. 295, 89 A.L.R. 720.

■ The consideration for a contract of employment may also be some special undertaking on the part of the employer corporation which it obligates itself to perform in order to secure employee's services. 14a C.J. p. 762, note 8; 19 C.J.S. Corporations § 1251.

■ As a matter of business judgment the C & O wanted to bind Tuohy's services to the company by an employment contract. Apparently realizing that the original employment contract would terminate on December 31, 1953, the board of directors negotiated with

their president to extend his employment contract. Here, too, was a bargain and exchange on the part of businessmen wherein each gave up something he believed to be of value to him and each received in exchange something he believed to be of value to him. There has been no evidence submitted here that Tuohy dominated the board of directors who voted to amend his employment contract. There is no evidence of any fraud or breach of trust on the part of the directors. Though the plaintiffs infer that Tuohy's compensation is excessive by grouping together his annual salary, pension payments and accruals; estimated annual retirement allowance and rights accrued under the stock option plan, there has been no record evidence put forth to show that a man of his stature and capability is not worth the compensation paid to him by the company.

Very obviously, as the years have rolled around to the impending year of 1958, Tuohy has gone on working exactly as the company planned he would, and the company has gone on profiting by his leadership exactly as the company planned it should, and Tuohy must gamble indefinitely on all the intangibles which constantly drive the stock market down. His chances for gain never exceed the probability of loss.

■ The decision as to the amount of working capital that should be available to the company as well as the propriety in dealing with or pledging stock held by the company as security for Tuohy's debt is a matter within the discretion of the board of directors concerning the internal affairs of the corporation.

From the record it is apparent that the board of directors acted in good faith within their corporate powers. The annual salary, together with the other benefits given to Tuohy under the amended employment contract are not clearly excessive.

■ A court of equity will not undertake to regulate or control the internal affairs or policy matters of a corporation or substitute its judgment for

that of the board of directors in the fixing of salaries or any other benefits, in the absence of fraud, breach of trust or where the salaries are not clearly excessive. Consolidated Cement Corp. v. Pratt, 10 Cir., 47 F.2d 90, Bisbee v. Midland Linseed P. Co., 8 Cir., 19 F.2d 24, 19 C.J.S. Corporations § 806, p. 203.

Plaintiffs allege that the amended agreement was not submitted to the shareholders for approval although the original stock purchase agreement had previously been approved by them.

The question before this court concerns an amendment to an employment contract. The stock purchase agreement of 1948 was subject to shareholder approval by its terms but the employment contract had no such provision.

The board of directors is the governing body of the corporation and they may exercise all of the corporate powers subject to restrictions imposed upon them by constitution, statute, charter or by-laws. 19 C.J.S. Corporations § 742, p. 80.

The power to fix the compensation of ministerial officers belongs to the directors of the corporation concerned rather than to shareholders or the court. Upright v. Brown, 2 Cir., 98 F.2d 802; Atlantic Suburban Gas & Fuel Co. v. Johnson, 81 N.J.Eq. 351, 88 A. 163; 14a C.J. p. 140 note 93, 19 C.J.S. Corporations § 804; Fitchett v. Murphy, 46 App.Div. 181, 61 N.Y.S. 182. Fletcher's Cyclopedia of Corporations, Vol. 2, pp. 568–571.

In the absence of provisions in the original employment contract to the contrary, the board of directors of the C & O were under no duty to submit the amendments of the Tuohy employment contract to the shareholders for approval.

During all these years the shareholders have unquestionably derived the benefit from Tuohy's continuance as their executive, and in this rather contentious world in which it is physically impossible to please all people, he has pleased all involved with this exception.

Plaintiffs allege further that the notice to the shareholders in the proxy statement of April 30, 1953, did not adequately disclose the full effects of Tuohy's amended employment contract.

In 18 C.J.S. Corporations § 544, we find stated the general rule as applicable here that notice to shareholders is sufficient if it gives them information on which they may exercise an intelligent judgment with reference to proposed questions. The notice need not specify the details of the business to be conducted. It is not necessary therefore, to disclose the full effects of any business transaction by the board of directors pursuant to their corporate powers.

We find the amendment to the employment contract is a valid enforceable contract supported by sufficient and adequate consideration.

We find that the decision as to the amount of working capital that should be available to the company as well as the propriety in dealing with or pledging stock held by the company as security for a debt is a matter within the discretion of the board of directors concerning the internal affairs of the corporation.

We find that Tuohy's amended employment contract was not subject to shareholder ratification.

We find that the notice to the shareholders in the proxy statement of April 30, 1953 with reference to Tuohy's amended employment contract is legally sufficient.

It is the opinion of the Court that the pleadings herein disclose that there is here no genuine issue as to any material fact and that defendants herein are entitled to summary judgment as a matter of law. The plaintiffs' complaint will be hereby dismissed as to the four causes of action therein.

Counsel shall prepare judgment entry in accordance with the foregoing opinion.